## IDAHO POWER CO. v. THOMPSON et al.

District Court, D. Idaho, S. D. April 28, 1927.

No. 1143.

1. Electricity ⬅11—Public Utilities Commission must require power company's rates to be just, reasonable, and nondiscriminatory.

Idaho Public Utilities Commission, created by statute, has power and duty to require that rates charged by power company be just, reasonable, and nondiscriminatory.

2. Electricity ⬅11—Electric company held to have burden to show rates ordered amounted to taking of property without just compensation.

In suit to enjoin enforcement of rates for electric service, burden of proof was on plaintiff on question whether rates fixed by order of Public Utilities Commission amounted to taking of plaintiff's property without just compensation.

3. Electricity ⬅11—Proof that electric rates amount to taking of property without just compensation must be clear and convincing.

In suit to enjoin enforcement of rates for electric service, on ground that they amounted to taking of plaintiff's property without just compensation, plaintiff's proof must be clear and convincing.

4. Electricity ⬅11—In determination of whether electric rate is confiscatory, commission or court need not accept either of conflicting views of single expert.

Where factor in determination of whether electric rates amount to taking of company's property without just compensation involves prophesy, or rests on opinion evidence, neither commission nor court is bound to accept absolutely either of conflicting views, or opinion of single expert, where but one testifies.

5. Electricity ⬅11—In determining whether electric rate is confiscatory, "reasonable or just return" is considered in judicial sense, as equivalent of "nonconfiscatory."

In determining whether electric rates fixed by Public Utilities Commission amount to taking of company's property without just compensation, "reasonable" or "just" return is considered in judicial, as opposed to legislative, aspect, and is understood as equivalent of "nonconfiscatory."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reasonable.]

6. Electricity ⬅11—Electric company's rate base is fair value of plant plus reasonable amount for working capital.

In determining rate base of electric company, court takes fair value of plant as of date of inquiry, computed on reproduction cost the-

ory, adding thereto reasonable amount for working capital.

**7. Electricity ⬡11—Original cost of power site land held incorrect measure of value in electric rate case.**

Original cost of power site land *held* not correct measure of land value in electric rate case, notwithstanding appraisement of such land is attended with great difficulties.

**8. Electricity ⬡11—In determining value of power site land in electric rate case, 12½ per cent. for overheads held excessive.**

In determining value of power site land in electric rate case, some allowance should be made for overheads, but 12½ per cent. is excessive.

**9. Electricity ⬡11—In determining cost of power plant, equipment, and grounds in electric rate case, possible expense for contingencies and omissions should be considered.**

In determining total cost of power plant, buildings, fixtures, equipment, and grounds, and hydraulic power works in electric rate case, possibility of expense for contingencies and omissions should be considered, and it is immaterial that such item appears under numerous classifications, such as "omissions, loss, breakage, and waste," and "contingencies."

**10. Electricity ⬡11—$250,000 held excessive for contractor's fee in electric rate case, involving two-year construction program.**

In electric rate case, $250,000 for contractor's fee in accounts for land, buildings, equipment, and fixtures *held* excessive for two-year construction program, since such amount would be approximately $400 per day.

**11. Electricity ⬡11—In electric rate case, item of contractor's fee rejected.**

In electric rate case, item of contractor's fee in accounts for land, buildings, equipment, and fixtures *held* rejected, on theory that so much thereof as had merit was compensated by reduced material costs.

**12. Electricity ⬡11—In electric rate case 4 per cent. contractor's fee rejected.**

In electric rate case, item of contractor's fee of 4 per cent. in account for transmission system *held* excluded.

**13. Electricity ⬡11—In electric rate case, cost of flooded lands will be considered, notwithstanding executory contract for conveyance to government.**

In electric rate case, actual cost of lands flooded by generating plant will be considered, notwithstanding executory contract with government, installing irrigation dam at such place, for conveyance of such lands to it.

**14. Electricity ⬡11—In electric rate case, item of interest in account for office equipment excluded.**

In electric rate case, interest item in account for general office equipment should be rejected, since there would seem to be no need for paying for such property until received and put in use.

**15. Electricity ⬡11—Allowance of 3 per cent. for planning and purchasing in connection with account for office equipment held reasonable in electric rate case.**

In electric rate case, there should be some compensation for planning and purchasing in connection with account for general office equipment, but 3 per cent is reasonable allowance.

**16. Electricity ⬡11—Additions to plant noted in rate case.**

Where, in electric rate case, operating revenues for all of 1924 and 1925 were to be considered, and possibly for 1926, for purpose of ultimate deductions, additions to plant during 18 months following June 30, 1924, may be noted.

**17. Electricity ⬡11—In fixing electric rates, court or commission must consider all proper elements of actual value and substantial elements of going value.**

Commissions charged with duty of fixing reasonable electric rates, and courts charged with restraining confiscation, must consider all proper elements of actual value, and may not adopt going value in broad sense, or reject its existing substantial elements.

**18. Electricity ⬡11—In fixing electric rates, element already considered under another head cannot again be considered under guise of going value.**

Commissions charged with duty of fixing reasonable electric rates, and courts charged with restraining confiscation, cannot, under guise of going value, consider an element which has been considered and given proper place under some other head.

**19. Electricity ⬡11—In determining going value in electric rate case, maintenance, taxes, and interest for construction should be projected beyond construction period.**

In determining going value in electric rate case, maintenance, taxes, and interest for construction should be projected beyond construction period, to cover time necessarily elapsing before plant can be brought into active service.

**20. Electricity ⬡11—Property considered as factor in electric rate-making ceases to be basis for credits to going value.**

As soon as any property of electric company has so far come into use that up to its entire value it may be considered as factor in rate making, it ceases to be basis for further credits to going value, for interest, taxes, or other accounts.

**21. Electricity ⬡11—In electric rate case, expense of attaching new business should be allowed in part as factor of going value.**

In electric rate case, expense of advertising and soliciting customers and attaching new business should be regarded in part as factor of going value.

**22. Electricity ⬡11—Electric company cannot capitalize franchise and monopoly in determining rates.**

Electric company's franchise, and monopoly which it enjoys, which is substantial equivalent of good will, are highly desirable and normally

cost sacrifice, but it cannot capitalize them in determining rate.

**23. Electricity ⌘11—In electric rate case, present economy of operation held not element of going concern value.**

In electric rate case, present economy of operation *held* not element of going concern value, though it may be consideration to be weighed in determining reasonable return.

**24. Electricity ⌘11—In rate case, electric company's credit held not element of going concern value.**

In electric rate case, company's credit *held* not element of going concern value, since ability to finance enterprise is but normal attribute of qualified utility corporation, and cannot be so capitalized.

**25. Electricity ⌘11—In electric rate case, "co-ordinating and unifying physical properties" should be considered in determining going concern value.**

In determining going concern value in electric rate case, some consideration should be given to "co-ordinating and unifying physical properties."

**26. Electricity ⌘11—General estimate of working capital may not be resorted to in electric rate case, where there is direct evidence of specific needs.**

Where, in experience of engineers, estimate has been found to be approximately accurate measure of working capital, it may be resorted to in rate case, in absence of something better, such as direct evidence of specific needs for working capital.

**27. Electricity ⌘11—In rate case $18,000,000 power company held entitled to maintain $51,-750 bank balances.**

In electric rate case, $51,750 *held* not unreasonable as "necessary bank balances" of $18,-000,000 power company, in computing working capital.

**28. Electricity ⌘11—$18,000,000 power company held not entitled to allow $50,000 for "contingencies" in computing working capital, after allowing $51,750 for bank balances.**

In electric rate case, $18,000,000 power company, which maintained bank balances of $51,750, *held* not entitled to allowance of $50,-000 additional for "contingencies" in computing its working capital, especially where such amount was estimate, and witnesses could not clearly explain its necessity.

**29. Electricity ⌘11—$19,820 held excessive, and reduced to $10,000, for "deferred valuation and rate expense," in determining electric company's working capital.**

In determining working capital of $18,000,-000 power company in electric rate case, $19,-820 *held* excessive, and reduced to $10,000, for "deferred valuation and rate expense," since much of such work was done by regular employees, whose total compensation was charged under other heads.

**30. Electricity ⌘11—Amount exceeding one month's operating expense not needed to meet electric company's matured obligations, in computing working capital in rate case.**

In determining working capital of electric company in rate case, amount in excess of one month's operating expense should not be needed to enable company to meet all matured obligations.

**31. Electricity ⌘11—Depreciation in electric rate case depends on whether property has same fair value it would have, if new.**

In determining depreciation in electric rate case, question is not whether company's property is worth less than at some other period of its use, but whether as it stands it has same fair value it would have, if new.

**32. Electricity ⌘11—Deduction must be made for depreciation in electric rate case.**

In electric rate case, some deduction must be made for depreciation on company's property.

**33. Public service commissions ⌘7—In determining depreciation in rate case, "fair value" implies consideration of factors material in negotiating sale.**

In determining depreciation in electric rate case, "fair value" implies consideration of all factors material in negotiating sale and purchase of property, such as wear, decay, deterioration, obsolescence, inadequacy, and redundancy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fair Value.]

**34. Public service commissions ⌘7—In determining depreciation in rate case, information procured by actual inspection is preferable to percentage method.**

In determining depreciation of electric company's property in rate case, information procured by actual inspection is preferable to so-called straight line or percentage method.

**35. Evidence ⌘543(1)—In determining depreciation in rate case, experienced engineer may submit appraisement made on assumption of correctness of records, exhibits, and evidence.**

In determining depreciation of electric company's property in rate case, experienced engineer may submit appraisement made on assumption of correctness of data found in company's records, exhibits, and evidence, since expert witness need not have personal knowledge of all material facts to be competent.

**36. Electricity ⌘11—Deduction for accrued depreciation in electric rate case does not necessarily conflict with sinking fund theory (C. S. Idaho, § 2473).**

In electric rate case, deduction for accrued depreciation is not in necessary conflict with sinking fund theory, established by C. S. Idaho, § 2473.

**37. Electricity ⌘11—Court cannot draw on accumulated depreciation reserve to supplement inadequate current income, or give electric rate base fictitious value.**

In electric rate case, court cannot draw on accumulated depreciation reserve to supplement

inadequate current income, and cannot compensate for past losses out of current income, or by giving fictitious value to rate base.

**38. Electricity ⬳11—Cost of unit of electric company, part of which was used by another company, held excluded from rate base.**

In electric rate case, cost of unit of electric company, part of which was used under contract by another company, which paid rent and rendered "stand-by" service, *held* excluded from rate base; but net income was divided by crediting system with amount approximating fair compensation for use of ratable share of basic investment.

**39. Electricity ⬳11—Electric company's merchandise account held excluded from consideration in rate case.**

In electric rate case, company's merchandise account *held* excluded from consideration, where it made no substantial difference whether it was or was not included in rate set-up.

**40. Evidence ⬳11—Unprecedented depression in Eastern Oregon and Southwestern and Southern Idaho is matter of public history.**

Eastern Oregon and Southwestern and Southern Idaho has passed through or is passing through unprecedented depression, so notorious as to be matter of public history.

**41. Electricity ⬳11—Electric rates yielding 7 per cent. held not confiscatory.**

Electric rates yielding return of 7 per cent. or over *held* not confiscatory.

**42. Public service commissions ⬳23—Public Utilities Commission's view as to allowance of item on account is not controlling on court in rate case.**

In electric rate case, view of Public Utilities Commission as to allowance of particular item on account is not controlling on court.

**43. Corporations ⬳393—Rule that court will not substitute its judgment for that of utility company's managing officers held inapplicable, where there is common control of utility and other contracting party.**

Though court will not generally substitute its own judgment for that of managing officers of utility company concerning contracts for supervision and special service, such rule is inapplicable, where there is common control of both utility company and party with whom it contracts.

**44. Electricity ⬳11—Service looking to better management, reduction of investment, or increase of net operating return of electric company is chargeable to operating expense.**

Any service looking to better management, greater efficiency, reduction of investment, or increase of net operating return of electric company is for benefit of consumers, and properly chargeable to expense of operation in rate case.

**45. Electricity ⬳11—Item of supervision and special service held allowed as part of operating expenses in electric rate case.**

In electric rate case, item of supervision and special service as part of operating expenses *held* allowed, but to be taken into considera-

tion as bearing on other factors of general problem.

**46. Electricity ⬳11—Regulatory commission expenses, allowed as item of electric company's operating expense.**

In electric rate case, amount allowed for regulatory commission expense as item of operating expenses will be larger than actually required for future needs, where considerable amount accruing from valuation and other attendant proceedings was carried in suspense.

**47. Electricity ⬳11—Electric rates must be just, reasonable, and nondiscriminatory.**

Rates for electric company, whether put out by utility or commission, must be just, reasonable, and nondiscriminatory.

**48. Electricity ⬳11—Electric company may "initiate" schedule of rates, and select either of alternative rate structures equally just.**

Electric company has right to "initiate"—that is, propose for approval—schedule of rates, and as between alternative rate structures, equally just and reasonable, it may select that which it chooses.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Initiate.]

**49. Electricity ⬳11—Proposed electric rates may become automatically effective when Public Utilities Commission takes no action.**

Where Public Utilities Commission does not take action in compliance with statutes, when schedule of rates is proposed by electric company, proposed rates may, in most cases, become automatically effective.

**50. Electricity ⬳11—Electric rates need not be uniform, but should be above cost of service.**

Electric rates need not be uniform, but, with rare exceptions, each should be above cost of particular service.

**51. Electricity ⬳11—Public Utilities Commission may fix electric rates for each class, and also classify, either on initiation of utility or its own motion (C. S. Idaho, §§ 2415, 2417, 2427, 2429, 2450–2452).**

Public Utilities Commission has power, not only to fix electric rates in each class, but to classify, and it may exercise it, either on initiation of utility or of its own motion, in view of C. S. Idaho, §§ 2415, 2417, 2427, 2429, 2450–2452.

**52. Electricity ⬳11—Function of Public Utilities Commission in fixing electric rates is purely administrative.**

Though Public Utilities Commission in fixing electric rates has responsibility calling for exercise of wide range of power and discretion, its function is purely administrative.

**53. Public service commissions ⬳6—Public Utilities Commission cannot initiate public policies of its own or invade field of managerial discretion left by Legislature to utility.**

Public Utilities Commission cannot initiate public policies of its own, or invade field of managerial discretion left by Legislature to utility, since within constitutional limitation, it is for Legislature to declare general policies of state.

**54. Electricity ⬤➡11—Public Utilities Commission, in determining whether electric rates are reasonable, must act on facts and be governed by considerations intrinsic to service.**

In determining whether schedule of electric rates is reasonable, just, and nondiscriminative, Public Utilities Commission must act on facts and be governed by considerations intrinsic to service, and cannot act out of respect for public policies, which Legislature has not prescribed.

**55. Electricity ⬤➡11—Schedule of electric rates, prescribing discount of one-third for charitable and other nonprofit institutions, held unauthorized.**

Public Utilities Commission held without power to make schedule of electric rates prescribing discount of 33⅓ per cent. from normal rates in favor of hospitals, fraternal organizations, commercial clubs, and benevolent, religious, or eleemosynary institutions.

**56. Electricity ⬤➡11—Electric rates, directing users of power for irrigation during preceding year should continue to receive service at same rates, held unauthorized.**

Special irrigation schedule of electric rates, in which commission directed that users of power for irrigation during preceding year should to extent of such use continue to receive service in future at same rates, held unauthorized.

**57. Electricity ⬤➡11—Consumers' contract rights may be enforced, regardless of schedules of electric rates.**

Until properly abrogated, consumers' valid contract rights may be enforced, regardless of schedules of electric rates.

**58. Electricity ⬤➡11—Electric rates of six-tenths of a cent and of 1 cent per k. w. h. for water heating held unwarranted in law.**

Schedule of electric rates applicable to water heating, establishing rates of six-tenths of a cent per k. w. h. and of 1 cent per k. w. h., held unwarranted in law as not being substantially compensatory.

**59. Electricity ⬤➡11—Electric rates for air heating, prescribing amounts ranging from $24.05 to $217.10 for 6 months' service, held invalid.**

Schedule of electric rates for air heating, prescribing amounts for 6 months' service ranging from $24.05 to $217.10, held invalid, as being insufficient to cover bare operating costs.

In Equity. Suit by the Idaho Power Company against J. M. Thompson and others, as the Public Utilities Commission of the State of Idaho and another, to enjoin the enforcement of rates for electric service. Certain rates held invalid.

Hawley & Hawley and A. J. Priest, all of Boise, Idaho, and John F. MacLane, of Salt Lake City, Utah, for plaintiff.

Albert H. Conner, Atty. Gen., John C. Rice, of Caldwell, Idaho, and Charles P. McCarthy and H. B. Walker, both of Boise, Idaho, for defendants.

Before RUDKIN, Circuit Judge, and DIETRICH and CUSHMAN, District Judges.

DIETRICH, District Judge. The suit is brought to enjoin the enforcement of a set of rates for electric service, prescribed by the Public Utilities Commission of Idaho in its Order No. 939, dated February 29, 1924, Record, vol. 1, p. 122. Having taken over several hydroelectric generating plants of smaller competing companies, which went into liquidation, plaintiff has further developed them and united them into a single system, from which it distributes electric current for light and power, for heat in cooking and heating water for domestic use, and for power in pumping water for irrigation purposes. Its territory is a small part of Eastern Oregon and the whole of Southwestern and Southern Idaho. In Southeastern Idaho it comes into contact with the Utah Power & Light Company, a neighborly, if not a kindred, company. In its field it is without substantial competition.

[1] The Idaho Public Utilities Commission, defendant, is created by the state statutes, with functions usual to such bodies, and has the power and duty to require that the rates charged be just, reasonable, and nondiscriminatory. Two main contentions are put forward by plaintiff; the first being that Order No. 939 is invalid because of irregularity in procedure by the Commission, and the other that the rates thus established are so low as to be confiscatory under the federal Constitution. Both issues are conceded to be within our jurisdiction.

[2, 3] We first discuss the question of confiscation, and hence for the moment we defer analysis of certain specific schedules, the sufficiency of which, viewed by themselves, is challenged, and consider only whether the rates fixed by the order, looking at them in their entirety, amount to the taking of plaintiff's property without just compensation. San Diego Land Co. v. National City, 174 U. S. 739, 754, 19 S. Ct. 804, 43 L. Ed. 1154. In respect to such an issue, the burden of proof is upon the plaintiff. Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 163, 35 S. Ct. 811, 59 L. Ed. 1244. And the proof must be clear and convincing. "The judiciary ought not to interfere with the collection of rates established under legislative sanction, unless they are so plainly and palpably unreasonable as to make their enforcement equivalent to the taking of property for public use without such compensation as under all the circumstances is just both to the owner and to the public; that is, judicial interference should never oc-

cur, unless the case presents, clearly and beyond all doubt, such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use." San Diego Land Co. v. National City, 174 U. S. 739, 754, 19 S. Ct. 804, 810 (43 L. Ed. 1154).

In San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 441, 23 S. Ct. 571, 572 (47 L. Ed. 892), a further statement of the rule is made as follows: "In a case like this we do not feel bound to re-examine and weigh all the evidence, although we have done so, or to proceed according to our independent opinion as to what were proper rates. It is enough if we cannot say that it was impossible for a fair-minded board to come to the result which was reached." See, also, Van Dyke v. Geary, 244 U. S. 39, 37 S. Ct. 483, 61 L. Ed. 973; Georgia Ry. Co. v. Ry. Com., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Darnell v. Edwards, 244 U. S. 564, 37 S. Ct. 701, 61 L. Ed. 1317; Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371; Minnesota Rate Case, 230 U. S. 352, 452, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; N. P. R. R. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1.

[4] And, it is to be added, where a factor in the problem involves prophesy, or rests upon mere opinion evidence, the commission was not, nor are we, bound to accept absolutely and without qualification one or the other of two conflicting views, or the opinion of a single expert where but one testifies. The Conquerer, 166 U. S. 110, 17 S. Ct. 510, 41 L. Ed. 937. And see Willcox v. Consolidated Gas Co., 212 U. S. 19, 50, 51, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

[5] We are to bear in mind, too, that the term "reasonable" or "just" return has a double aspect, one legislative and the other judicial, and that we are here concerned with it only in the latter sense. So understood, it is the equivalent of nonconfiscatory. Judicially a rate is unreasonable only when it yields a return less than the minimum which the capital invested may of right demand. In the legislative aspect the return may exceed such amount; that is, the Legislature or the commission may, without being unjust or unfair to the rate payer, add a substantial increment to this minimum in order to carry out some public policy. Detroit & M. R. Co. v. Michigan R. Com. (D. C.) 203 F. 864, 870. "A commission or other legislative body, in

its discretion, may determine to be reasonable and just a rate that is substantially higher than one merely sufficient to justify a judicial finding in a confiscation case that it is high enough to yield a just and reasonable return. * * * It is well known that rates substantially higher than the line between validity and unconstitutionality properly may be deemed to be just and reasonable, and not excessive or extortionate." Banton v. Belt Line Ry. Co. (Dec. May 25, 1925) 268 U. S. 413, 45 S. Ct. 534, 69 L. Ed. 1120. See, also, San Diego Co. v. Jasper, 189 U. S. 439, 23 S. Ct. 571, 47 L. Ed. 892; Galveston Electric Co. v. Galveston, etc., 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; Chesapeake, etc., v. Whitman (D. C.) 3 F.(2d) 938; Spring Valley Water Co. v. San Francisco (D. C.) 252 F. 979; U. P. Ry. Co. v. Com., 95 Kan. 604, 148 P. 667; City of Portsmouth v. P. U. C., 108 Ohio St. 272, 140 N. E. 604. It follows that an expression or finding of the defendant commission of what it deemed to be just or reasonable is not necessarily to be understood in a judicial sense, or as implying that, in the view of that body, anything less would be confiscatory.

### Rate Base.

[6] Formally, at least, both parties recognize the rule to be that for rate base we are to take the fair value of the plant as of the date to which the inquiry, touching sufficiency of net return, relates, adding thereto a reasonable amount for working capital. Both studies are made along the line of the reproduction cost theory. In the briefs is to be found some discussion of the question whether or not cost of reproduction is to be considered the "dominant" factor. But mere terminology is unimportant; whether dominant or not, it is a prime factor. It is not to be used as a formula, and is subject to many qualifying considerations; but nevertheless, broadly speaking, it is basic, and in both studies it is generally so treated. The parties also agree upon taking June 30, 1924, as the date for fixing the value of the rate base, and the evidence of reproduction cost, directly or indirectly, relates to that date.

I. *Property in Existence December 31, 1919, and Still Embraced in the Plant as of June 30, 1924, Exclusive of Accounts (1) Organization, (2) Franchises, (3) Water Rights, (37) General Office Equipment, and (39) Utility Equipment, Which Five Accounts are Considered Separately.*

(Note.—Both sides carry the same classifications under identical account numbers.

For illustration, see Plaintiff's Exhibit 16a, vol. 1, p. 238, and Defendants' Exhibit 27, p. 419.)

Reserving for separate consideration the five accounts mentioned in the above heading, and deferring consideration of the factors referred to as "Working Capital," "Going Concern Value," and "Depreciation," the parties have divided the property into two groups as indicated in the heading; First, the properties in existence December 31, 1919, and still constituting a part of the system; and, second, the additions made during the period intervening between that date and June 30, 1924. Touching the latter group there is no substantial controversy.

Confining our attention to the first group, it appears that Rankin, plaintiff's engineer, fixes the reproduction cost as of June 30, 1924, at $13,178,318, which is $1,616,627 in excess of the appraisal by Kopelman, the defendants' engineer. (See first two columns Defendants' Exhibit 43, vol. 1, p. 474, and Plaintiff's Exhibit 45, vol. 1, p. 486.) The slight discrepancy in the two tabulations is negligible. Aside from the somewhat distinctive Oxbow item of $350,000, and interest, the differences relate largely to land values and overheads, or "undistributed costs" of different kinds, and involve many questions of a speculative character.

It will aid in understanding the issue to say that, some time prior to the making of Order No. 939, plaintiff, in compliance with the requirements of the commission, at great expense caused to be prepared and filed with the commission a detailed inventory of all its property, both used and unused, together with its appraisal thereof as of December 31, 1919. With unimportant exceptions, both parties now resort to this as a complete and correct descriptive list in detail of the property as it existed at that date, eliminating, of course, from their consideration in making their appraisals, such items as did not, on June 30, 1924, constitute any part of the useful plant.

They differ only in respect to reproduction cost and the factors entering into such cost. Moreover, there is no serious contention by plaintiff that there was any increase in land values or construction costs during the period from 1919 to 1924; if there was any change, the testimony tends to show a decrease, but the point is not of great importance. For present purposes we may therefore assume that the reproduction cost was substantially the same in 1919 as it was in 1924.

As a part of its elaborate inventory as of December 31, 1919, plaintiff included a detailed appraisal upon the basis of historical actual cost, in so far as that could be ascertained, and also of reproduction cost as of December 31, 1919. In respect thereto, it now alleges in its complaint:

"Pursuant to its intention to procure an adjustment of its rate structure, and in compliance with said act of the Legislature, the power company made and prepared a detailed inventory and appraisal of its property in Idaho and Oregon. Said inventory and appraisal was prepared with great care and in great detail; inspection and count of all physical property, so far as the same could be examined, was made in the field, and an examination was made of the original cost of said property, so far as ascertainable, as required by the said act of the Legislature and the instructions of the commission thereunder, and also of the cost of reproduction of said property, and included all property of the power company in both Idaho and Oregon, operative and nonoperative, as of December 31, 1919."

Though he personally shared in making it, the plaintiff's engineer now declines to abide by this appraisal, which, as we have seen, the complaint alleges "was prepared with great care"; and hence the major part of the difference between him and the commission's engineer in their appraisals. In a measure similar considerations apply to the large difference in respect to land values. While Kiersted, who is now and in 1919 was in the plaintiff's employ, did not himself directly make the appraisal of 1919, he caused the same to be made by realtors, presumably competent; he supervising the work and checking the reports. The present appraisement he himself made in the field; his values being greatly in excess of those of his agents in 1919.

In view of these facts a most serious question arises whether, after a public utility company, in the course of proceedings to establish rates, has presented to the commission appraisals of its property, carefully made, and the commission has acted upon the basis of such appraisals, the company can, without first seeking relief from the commission, apply to a court to set aside as being confiscatory an order so made by the commission. But, however that may be, weight cannot be denied the consideration as bearing upon the persuasiveness of the theories and opinions now put forward by the witnesses responsible for the former appraisals. It is not a case where a witness has, through inadvertence, or by reason of faulty information, testified er-

roneously in respect to substantive facts. The differences involved in the issue are largely such as arise out of a resort to different reasonable theories and assumptions as the basis of computations, or as are due to the fact that the evidence largely consists of opinions necessarily involving a measure of speculation.

1. *Lands.*

The general item covers accounts 5, 6, 7, 9, 10, and 12, namely, "Power Plant Lands," "Transmission Lands," "Substation Lands," "General Office Lands," "Store Department Lands," and "Other Lands." While we have considered the evidence and the briefs in respect to the several classes in detail, we here group them together and separately refer to only certain features. Plaintiff's appraisal, exclusive of the so-called overheads in acquiring lands, and interest during construction, aggregates $234,069. It adds $19,311 for overheads and $20,267 for interest, making a total of $273,647. Overheads are computed on all but the "Transmission" account, by adding to direct cost 6½ per cent. for "engineering and supervision," and 6 per cent. for "undistributed construction costs"; that is, as explained, abstracts, recording, legal expenses, etc. The interest is computed at the rate of 8 per cent. for one year on this aggregate. Defendants' appraisal is $66,808, direct cost, to which is added interest, computed upon the basis used by plaintiff, $3,801, or a total of $70,609. No allowance is made for engineering or undistributed construction costs.

It will thus be seen that plaintiff's appraisals, exclusive of overheads and interest, is $167,261 higher than that of defendants. Of this amount $81,206 is on account of the six power plant sites and $73,444 for transmission rights of way. As to power plant lands in a high degree, and as to the rights of way in a very considerable measure, the elaborate discussion of the difficulties in making an appraisal and of proper and improper considerations found in the opinion of the Supreme Court in the Minnesota Rate Cases, 230 U. S. 352, 443, et seq., 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, is applicable. Apparently there is no standard to which the value of the power plant lands can be referred; for that reason, and in the light of the Minnesota Rate Cases, it is doubtful whether plaintiff's right of way agent, the only witness who testified directly upon the subject, was competent to express an opinion. He did not as an expert testify as to the market price, for there is no market standard. As in the Minnesota Rate Cases,

he really makes an attempt, however disguised, to fix the value of property to the plaintiff under conditions which no one can say would exist, but for the fact that the sites have been used and that such use has in a measure brought about the very conditions which contribute to value. It would seem to be one of those cases where, if we put aside the actual cost theory and take the most favorable view to plaintiff, a so-called expert is little, if any, more competent than a judge or a jury to express an opinion, which in either case is but a conclusion from the pertinent facts.

Plaintiff also resorts to the charge made by the government for use of public land needed in the development of power plants. But by a parity of reasoning it could be argued that transmission rights of way are of no value, because they may be acquired over public lands at a nominal cost. Both laws were doubtless enacted in furtherance of public policies without regard to the fair value of the lands. If such laws are to be taken as establishing standards of value, what, might be asked, would be the fair value of a narrow mountain canyon upon the public lands, desirable both for railroad right of way, for which no charge is made, and for power development in which case a charge is made?

Entertaining the view that there is no other available standard, defendants' engineer took as the measure of value the original cost of these lands, this being the standard adopted by plaintiff in its appraisal of December 31, 1919.

[7] As to the transmission rights of way and all other lands, plaintiff's engineer adopted the appraisement of its right of way agent and defendants' engineer the valuation made by agents employed by him for that purpose. While appraisement, especially of power site land, is attended with almost insuperable difficulties, we do not think that the original cost, where the property was acquired many years ago, is a correct measure.

[8] Some allowance should be made for overheads, but 12½ per cent. is thought to be excessive. More manifestly is this true of the item for engineering. Most of the possible engineering is a necessary construction element, in respect to which ample allowance is made under other heads. Let us suppose that at the outset plaintiff was the owner of large bodies of lands embracing the small tracts used, it would be under the necessity of determining the most feasible locations for its power plants, transmission lines, and other structures. All such engineering would necessarily be considered as cost of construction, and not of acquiring the land; for, under the

hypothesis, plaintiff already has title. But it is quite unimportant whether such investigation and engineering work are done before or after acquisition of the lands; the function is the same in either case. Engineering incident to acquiring title must consist mainly in defining boundaries and computing areas. But in respect to building sites the acquisition almost without exception is of lots, in platted townsites, and in respect to rights of way the location of the pole line, an element of construction, is generally all that is required for descriptive purposes. Even in some cases of power sites, the acquisition was of tracts described in recorded surveys.

The other item of overhead, abstracts, recording, etc., amounts in plaintiff's set-up to $5,944 for the six power sites. In case the value of the sites is reduced one-half, the item is correspondingly reduced, although presumably there would be no difference in the actual expenditures it is supposed to cover.

The 40 acres at Horseshoe Bend we exclude as being neither used nor useful; for like reasons a portion of the 8 acres at Weiser is excluded.

Applying as best we can to the evidence the principles approved in the Minnesota Rate Cases, we estimate these several land accounts as follows:

Power sites ...................... $44,600
Five per cent. for overhead.......... 2,230
                                     _____
    Total ...................... $46,830
Transmission lands (giving consideration to, but not stating separately, the so-called overheads) ............ $51,840
Substation lands..................... $22,425
Five per cent. for overhead.......... 1,121
                                     _____
    Total ..................... $23,546
General office lands................. $12,000
Five per cent. for overhead.......... 600
                                     _____
    Total ..................... $12,600
Store department lands.............. $ 9,425
Five per cent. for overhead.......... 471
                                     _____
    Total ..................... $ 9,896

The item of "Other Lands" plaintiff concedes to be erroneous, and should be ignored. The total of the five items is $144,712, to which we add interest at 8 per cent. for one year, or $11,577, making a grand total of $156,289.

2. *Accounts Nos. 16, 18, 19, 20, and 21—Buildings, Fixtures, and Grounds (Other than Power Plant).*

There are six accounts for "Buildings, Fixtures, and Grounds." (By grounds we understand is meant improvement of grounds,

aside from the original cost of site.) One of the accounts, No. 13, covering power plant buildings, etc., will be considered in connection with other related power plant structures. We here group accounts Nos. 16, 18, 19, 20, and 21, covering buildings, fixtures, and grounds for substations, stores department, utility equipment, general office, and other buildings, fixtures, etc.

Kopelman's aggregate for the five accounts is $317,206, while Rankin's is $286,418. The methods pursued are so different that comparison is impracticable, and inasmuch as plaintiff, waiving discussion, expresses a desire that its appraisal be taken, we adopt $286,418 as a measure of reproduction cost.

3. *Accounts Nos. 13, 24 and 25, Namely, Power Plant Buildings, Fixtures and Grounds, Hydraulic Power Works, and Power Plant Equipment.*

These are the three accounts covering power plant structures. Rankin's aggregate is $5,473,523; Kopelman's, $4,811,897—a difference of $661,626. (Volume 1, p. 498.) In the main the difference is to be found in the larger allowances made by Rankin for omissions (including loss, breakage, and waste), contingencies, overheads, interest during construction, and the item of contractor's fee, which Kopelman ignores entirely. Both parties compute interest at the same rate and for the same period; Rankin's excess being due to the larger base used by him. The difference in interest is $49,246, and the 4 per cent. contractor's fee allowed by Rankin amounts to $167,571. The two items aggregate $216,817, which, deducted from the total difference of $661,626, leaves a remainder of $444,809.

By plaintiff this is regarded as covering contingencies and omissions, but under defendants' set-up it is to be regarded as representing the difference in allowance for field overheads or undistributed field costs, including omissions and contingencies. In either view the figures are not precisely accurate, for there are other differences in the set-ups, and this is the net result of all. But for practical purposes it may be said to represent a difference in overheads and undistributed costs, including contingencies and omissions.

[9] At page 680 of volume 2, Rankin explains what he means by contingencies and omissions. Undoubtedly the possibility of such expenses should be given consideration in estimating the total cost. Upon that point there is no controversy; Kopelman concedes it. Furthermore, in appraising an existing plant by inventory, some of such items would not appear. Sag in transmission wire would

be observable, but a lost crossarm or a broken insulator would not. In projecting a new plant, they would have to be estimated as contingencies; and also in appraising the cost of an existing plant, where there are no records of actual cost, they would have to be estimated in like manner, except in the comparatively few cases where they are to be observed in the structures.

So in appraising the cost of reproducing new the plant as it stood in 1919, it became necessary to give consideration to this factor, and in making its appraisement as of that time, which as we have seen plaintiff alleges was carefully made, it was considered, and allowances were made on account thereof.

In passing, it may be observed that there is nothing of substantive value in the fact that Rankin carries numerous classifications. For example, he allows a percentage for "omissions, loss, breakage, and waste," and separately another percentage for "contingencies." But plainly omissions, loss, breakage, and waste are contingent until they happen, quite as much as any other possible contingency, and after it has happened a contingency ceases to be contingent. In reality it is thought that all such items are contingencies and should be carried under the one head.

So, if we make just allowance for contingencies, it is quite unimportant whether we treat them as direct or indirect field costs. If there were an established percentage, it would, of course, be material to determine upon what base it is to be computed; but there is no such established rate, and hence, if the result is the same, it is immaterial whether we reach it by computing a higher percentage on a smaller base, or a lower percentage upon a larger base. Accordingly, while we may be of the opinion that contingencies are generally more properly carried as indirect field costs, we pass the point as being of too slight importance to warrant further discussion.

The difference between the engineers in the main arises out of the fact that upon the one hand Kopelman insists that the appraisement made by plaintiff as of December 31, 1919, fortified, as he says, by his own judgment, based upon other data and independent observation, is fair, while Rankin, ignoring that appraisement entirely, insists upon estimates deduced from plaintiff's experience in new construction work carried on during the period from December 31, 1919, to June 30, 1924. Much may be said in support of either view, but obviously neither is necessarily conclusive. In the 4½ years since 1919 plaintiff has done a large amount of construction work,

approximating $5,000,000, and it may be assumed that its accounts have been more complete and more scientifically kept than those of its predecessors. But, on the other hand, much of the work done during that period has consisted of adding to or replacing old units of the existing plant, and for that reason the elements of uncertainty are not always comparable to those incident to wholly new construction. While Rankin states that he derives the percentages from this specific experience, the experience itself is not brought before us in any concrete form. He made no computation of the amount of any item of contingency as realized in such experience, and if a "contingencies" account was kept, manifestly its significance in respect to some other job or in respect to the present problem would depend upon divers considerations:

How was it kept? What went into it? If it represented the difference between what was shown on the blueprints or was called for by the specifications, and if it was made ultimately to balance preliminary estimates with actual, realized cost, then how carefully were the blueprints prepared, with what detail and degree of accuracy were the specifications drawn, and what were the bases of the preliminary estimates of cost, and with what judgment and care were they made? Upon these points we are not advised, and while the witness repeatedly says he resorted to the plaintiff's experience for the 4½ years, he does not explain by what process he ascertained the facts of such experience, or how he made his deductions therefrom. In truth, when in respect to his set-up for transmission costs, he was on cross-examination asked the question, "How do you arrive at the field overhead which you add for loss, breakage, omission, etc.?" his answer was: "That is entirely a matter of judgment. I know of no way to determine it." Apparently the answer is equally applicable to the whole subject of contingencies and omissions, both in this and in other accounts. It is a matter of judgment.

If it is a matter of judgment, while some light may be gotten from the four and a half years' experience, the judgment of 1919 was not wholly benighted. Plaintiff had had between 3 and 4 years' actual experience in operating the property. It made a very exhaustive study of it for the purpose of inventory and appraisement. It had done some, though not a large amount of, construction work during the period of its ownership, and presumably kept complete and accurate records which were available and used in making the

appraisement. It had had a part of the experience upon which it now relies between December 31, 1919, and June 30, 1924, for it must be borne in mind that while the appraisement was made as of December 31, 1919, it was not in fact made until a later date. It had partial records of actual construction cost kept by the original owners by whom the work was done. The art was not new, and presumably there was available to plaintiff's appraising agents the experience of other companies in other fields in the construction of similar works. And recognizing the potency of the motive of self-interest, we must assume that plaintiff attempted at that time to make as favorable a showing for itself as was reasonably possible. It claimed an aggregate of approximately $930,000 for field overheads, including $168,522 for contingencies, $157,408 for omissions, and $185,416 for unclassified expenditures.

The susceptibility of overhead percentages to variation is exemplified in the General Office Equipment Account, in itself of little importance, but referred to for illustrative purposes, because it is comparatively simple and is more within the range of our common knowledge. In its set-up for 1919, plaintiff added as overhead upon this account 3 per cent., while presently it claims 7½ per cent.

*Contractor's Fee.*

[10, 11] As already indicated, plaintiff adds for what it calls contractor's fee 4 per cent., or $167,571, computed, as we understand, upon what are termed field costs in these three accounts, and a similar addition is made in account No. 28, "Transmission System," amounting to $82,488.

It would seem that this is not intended as compensation or profit to a construction contractor in the ordinary sense, for doing work in the field. The set-up is upon the assumption that the work is done by plaintiff itself, with adequate allowance for engineering, supervision, and field and other general overheads. In explanation of the charge, plaintiff's engineer testifies that in his opinion, if the 4 per cent. were not paid to what he calls a contracting firm, the plaintiff itself would be under the necessity of maintaining quarters in a commercial center, preferably New York, "in order to bring about the lowest possible cost of the work." (Volume 2, p. 31.) The service for which the $250,059 is to be paid in constructing generating plants and transmission system, as they existed in 1919, is such service therefor as would be rendered in New York. In further explanation, the engineer testifies that such services would consist of negotiations for the purchase of equipment, by which better prices would be gotten, holding conferences with manufacturers to determine what is best suited, with a view of possible changes in specifications, making inspections in factories and witnessing factory tests, expediting shipments, sending out tracers, etc. (Volume 1, pp. 20, 21.)

In the first place, we think $250,000 to be excessive for such a service. The period assumed by both sides for the construction program is two years, and such allowance would therefore be at the rate of $125,000 a year for the "contractor," or approximately $400 per day, exclusive of Sundays.

In the second place, plaintiff includes under other headings charges which in part must relate to the same class of service. We have not taken the pains to segregate for this purpose the costs for property as of December 31, 1919, from later additions, but in its set-up for the entire plant as of June 30, 1924, plaintiff charges, in the four accounts for which the contractor's fee is claimed, $88,115 for purchasing and warehousing, and in accounts 13, 24, and 25 alone, for engineering in New York, $57,754. This engineering in New York, it is to be noted, is in addition to local engineering, which in the four accounts amounts to $199,900, and still other engineering and supervision amounts to $432,242. (Defendants' Exhibit 29.)

Finally, it would seem to be clear that, if the plant is to be charged with the expense of obtaining reduced prices of equipment, it should be credited with the fruits of such service. Yet we find that, in making its set-up of cost of reproduction, plaintiff adopted, as the measure of cost of materials, quotations given it by manufacturers in response to its request for prices; such request being accompanied with the explanation that the prices were desired for valuation purposes. No consideration was given to the price which might be obtained for quantity purchases or on competitive bids. Prices of standard materials and supplies were apparently taken from published lists.

We are persuaded that so much of this item as has merit is more than compensated by the reduction in material costs which could be obtained upon quantity purchases, under such competitive conditions as would prevail in case of actual construction, as compared with the price standards here used in making estimates. Hence the item will be rejected.

Upon consideration, we allow upon these three accounts $4,565,000, to which $365,200 is added as interest during construction, making a total of $4,930,200.

4. *Account No. 28—Transmission System.*

[12] Exclusive of interest, Rankin's appraisal is $2,413,013; Kopelman's, $2,155,651—a difference of $257,362. The difference involves substantially the identical considerations discussed in the preceding subdivision No. 3. We might add, in respect to the 4 per cent. contractor's fee, amounting in this account to $82,488, that it would be interesting to know what the New York "contractor" would do to earn it. Right of way does not enter into the account; the poles and cross-arms are presumably purchased in Idaho, or in neighboring states; wire and insulators are standard, and the former, at least, plaintiff informs us, is not subject to quantity price; and we are not advised that factory tests or conferences in respect to design are required. Construction is a matter for local engineering and supervision.

The item is excluded, and upon this account as a whole we allow $2,200,000, with interest amounting to $176,000, or a total of $2,376,000.

5. *Accounts Nos. 29, 31, 32, 33, 35, 36, 38, and 40.*

In no one of these accounts is a contractor's fee claimed, and generally they involve the other considerations discussed under the preceding paragraph No. 3. No purpose would be served in treating them separately. In some cases the difference in results is large, and in others comparatively small. In one account Kopelman's appraisal is substantially larger than Rankin's. Excluding interest, in respect to which both engineers agree as to method, the appraisals are as follows:

| No. | Account. | Rankin. | Kopelman. |
|-----|----------|---------|-----------|
| 29 | Substation equipment | $ 625,173 | $ 633,041 |
| 31 | Distribution system | 1,920,369 | 1,806,730 |
| 32 | Transformers | 630,632 | 509,051 |
| 33 | Meters | 372,783 | 365,937 |
| 35 | Municipal contract systems | 224,755 | 217,654 |
| 36 | Telephone | 128,565 | 108,735 |
| 38 | Stores department equipment. | 1,447 | 1,345 |
| 40 | Miscellaneous equipment | 29,456 | 27,384 |
| | Total | $3,833,178 | $3,669,877 |

We allow for the accounts in the aggregate $3,711,000, adding interest, $296,880, or a total of $4,007,880.

5. *Oxbow Unit.*

One of the plaintiff's predecessors projected a large power plant on the Snake river at Oxbow, near Huntington, Or. After a considerable expenditure, unexpected obstacles were encountered, and further development was suspended, if not abandoned. During subsequent receivership, to meet an emergen-cy, a small temporary unit was installed. The head is small, and owing to want of dam control and accumulation of ice in the winter the generation is variable and uncertain, running from 100 to 700 k. w. There is no attempt to resort to reproduction cost in fixing the value, but plaintiff seeks to capitalize the service value at $400,000, and defendants contend that a substitute plan of equal serviceability could be installed at a cost of about $59,000. For the purposes for which it is used, the value of the unit necessarily depends largely upon the maximum generation which may be expected at all times, and, as we have seen, that is little in excess of 100 k. w. We do not understand plaintiff's contention to be that a plant of the general character proposed by defendants is impracticable, but only that such a plant would have to be larger than the one the cost of which is estimated at $59,000. At least we are convinced that a larger plant would render the service. Considering all the evidence, we estimate the value of the unit at $150,000.

II. *Accounts Nos. 1, 2, 3, 37, and 39—Organization, Franchises, Water Rights, General Office Equipment, and Utility Equipment.*

As already indicated, following plaintiff's analysis, we have excluded from the foregoing consideration the above numbered and entitled accounts, and in harmony with the treatment thereof by both parties we now briefly discuss their value as of June 30, 1924, without regard to the appraisement of December 31, 1919.

(a) *Organization.*

Plaintiff's appraisal is $500,000; defendants', $366,524. We have given consideration to the bases of both appraisals, but it would unduly prolong the opinion to discuss them. We allow $400,000.

(b) *Franchises.*

On this item the parties agree, and therefore we allow $14,688.

(c) *Water Rights.*

[13] Plaintiff's appraisal, $201,046; defendants', $39,751. The difference consists in the actual cost to plaintiff and its predecessors of lands flooded by the generating plant at American Falls, aggregating $149,347, to which plaintiff adds interest during construction, amounting to $11,984. The federal government is installing there a large irrigation dam, and has entered into a contract with the plaintiff by which, for certain considerations, title to the flooded lands is to be conveyed to the government. But for this contract defendants would not question the item.

Ultimately it will probably be proper to adjust plaintiff's accounts, so as correctly to reflect the status which will result from the execution of the provisions of the contract. But, inasmuch as of June 30, 1924, the contract was still executory, and the benefit plaintiff is to receive from the contract is in part, at least, to contribute to the value of its plant in use, we deem it proper here to carry the item as of the cost of lands under the presumption that what the plaintiff is getting from the government is a full equivalent. We therefore allow the full amount of plaintiff's claim, namely, $201,046.

(d) *Account No. 37—General Office Equipment.*

[14, 15] Plaintiff's appraisal is $115,247; defendants', $104,086. The difference consists of a charge by plaintiff for overhead, $7,806, and interest during construction, $3,355. The property items entering into the account are so numerous that defendants' engineer accepts without qualification plaintiff's inventory and appraisal, but rejects the two charges for interest and overhead.

As to interest, there would seem to be no need for paying for such property until it is received and put in use, and there could be need for but little of it while the plant is in the course of construction, and, if any of it was so used, such use is otherwise covered in general overhead, field overhead, and camp and office equipment. There should be some compensation for planning and purchasing, and on that account we add 3 per cent. to cost, which is the percentage plaintiff itself claimed to be reasonable in its 1919 appraisement of such overhead. (Volume 1, p. 442.) On this account we allow $107,209.

(e) *Account No. 39—Utility Equipment.*

The amount was agreed upon, and accordingly we allow $52,696.

III. *Property Additions from January 1, 1920, to June 30, 1924, Valued as of the Latter Date.*

Plaintiff's aggregate appraisal on these additions is $6,399,178. Defendants' engineer's estimate is slightly higher, but upon plaintiff's suggestion, to avoid necessity of discussion, we take its figures. It concedes that $31,857, the appraised value of the Caldwell building, should be deducted, for the reason that the building is erroneously included in the set-up. Making this deduction, we allow $6,367,321.

IV. *Property Additions from June 30, 1924, to December 31, 1925.*

[16] Inasmuch as, for the purpose of ultimate deductions, operating revenues for the whole of 1924 and for 1925 are to be considered, and possibly for 1926, additions to the plant during the 18 months following June 30, 1924, may be noted. Plaintiff claims, and we find no denial by defendants, and hence we find such additions to be:

For the last six months of 1924.... $ 81,228.00
And for 1925.................... 200,000.00
(See Plaintiff's Brief, p. 270.)

### Going Value.

Plaintiff claims $2,500,000. Defendants do not concede any specific amount, but in its rate-making orders the commission allowed $825,682. In its legal aspect the question is to be referred to comparatively recent decisions of the United States Supreme Court, those most relied upon by one side or the other being Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; Galveston Electric Co. v. Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. Ed. 678; Houston v. S. W. Bell Tel. Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Denver v. Denver Union Water Co., 246 U. S. 178, 38 S. Ct. 278, 62 L. Ed. 649; Lincoln Gas & Electric Co. v. Lincoln, 250 U. S. 256, 39 S. Ct. 454, 63 L. Ed. 968; Georgia Ry. & Power Co. v. R. R. Com., 262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144; Ft. Smith v. So. W. Bell Tel. Co. (Dec. January 25, 1926), 270 U. S. 627, 46 S. Ct. 206, 70 L. Ed. 768, affirming, without opinion, lower court (D. C.) 294 F. 102.

[17, 18] As we construe these cases, they do not sustain the broad contention of either party. From all of them we deduce the view that commissions charged with the duty of fixing reasonable rates, and courts charged with the responsibility of restraining confiscation, are to give consideration to all proper elements of actual value, and may not adopt going value in a broad, indefinite sense, or reject its substantial elements when they are shown to exist. Nor under the guise of going value should an element be again considered which has been given proper place under some other head. It is commonly known, and the testimony here well illustrates, that the term "going value" is highly elastic, and that at will it is used to embrace much or little. In a broad sense it may be understood to cover what is ordinarily referred to as "good will." Probably out of deference to the express holding of the Supreme Court, plaintiff has not in terms claimed good will as an element of such value; but it is not clear that, in appraising going value, it puts aside all of the considerations covered by "good will," even in the strict

sense apparently intended by the Supreme Court.

In weighing the subject, we are not to assume an irrational building program, but a normal development, whereby construction neither lags far behind nor wastefully anticipates remote possibilities, or even probabilities. To meet future probable needs, however, basic structures may sometimes prudently be built at additional cost, to provide capacity for new installations of equipment as growth of business may from time to time require.

[19] There is merit, we think, in plaintiff's contention that interest for construction should be projected beyond the construction period, strictly speaking, to cover the time necessarily elapsing before a plant of reasonable capacity can be brought into active service; also something for maintenance and taxes. By this we do not mean that these factors are to be computed upon all unused capacity, or indefinitely upon units which are susceptible to uses other than those to which they are for the time being devoted. Although all of plaintiff's property is not now being used to full capacity, it demands rates that will yield a fair net return on the entire value. Its dams may be adequate for additional generating installations, and its transmission lines may have capacity to carry additional current; but it deducts nothing from their total cost in the present set-up. Apparently the practice has prevailed throughout the entire history of operation and its propriety is not here challenged.

[20] As soon as any property has so far come into use that up to its entire value it may properly be and is considered as a factor in rate making, it ceases to be the basis for any further credits to going value for interest, taxes, or on other accounts. Such costs then become chargeable against operating revenue, and cannot also be capitalized. As to just when that time arrives in any given case, judgments may differ; but the point is that both courses cannot be pursued in respect to the same item, resulting in a double charge. The state statutes require rates to be just and reasonable. If a rate structure is just and reasonable only upon the assumption that the entire value of the existing plant constitutes the base, though not fully in use, then by hypothesis such rates become measurably unjust and unreasonable, if the surplus capacity is withdrawn to serve as the basis of building up going concern value, after such rates have been paid by consumers.

[21] So as to advertising and soliciting consumers, and generally attaching new business, the cost thereof might properly be assigned to capital investment; but it must also be conceded that there is no inherent reason why, with the consent of all parties, it might not be treated as an expense of operation, and in business generally it probably is so treated. With the approval or acquiescence of the commission, such apparently has been the practice of plaintiff.

It now contends, however, that, with business so attached, the physical property is more valuable, and, regardless of how the accounts may have been kept, we must, for rate-making purposes, give full value to the plant as it stands. But the increment of value was, in part at least, not contributed by or at the expense of the plaintiff, but by the public. It has no greater right to capitalize it than it has to capitalize the value of franchise and monopoly. Though the expense might have been treated as capital investment, rates were made to cover it, in part at least, as an expense of operation. It may be true, as counsel suggests, that the question is not one of mere accountancy, but involves the fundamental concept of value, and that intrinsically anything desirable has value, if normally it costs sacrifice to produce it, regardless of whether or not it entailed sacrifice in the particular case; that a dollar has the same value when found or obtained by gift as when earned. But the conclusion implied in the general application of the principle here does not necessarily follow. There is also the principle that one has not the right to reap from another's sowing.

[22] Plaintiff's franchise and the monopoly it enjoys, which is the substantial equivalent of good will, are without doubt highly desirable and normally cost sacrifice; but it is not permitted to capitalize them. Georgia Ry. v. R. R. Com., 262 U. S. 625, 632, 43 S. Ct. 680, 67 L. Ed. 1144. They were provided by the public for public and not for private benefit. It is not merely a question of accounting. Having asked for and been granted a set of rates to cover the outlay, at least in part, as an expense of operation, and having gotten the benefit thereof, it is estopped from setting up an opposing theory, and now claiming such outlay as capital. "Of course," says the court in Monroe G. & F. Co. v. Mich. P. U. C. (D. C.) 11 F.(2d) 319, 323, "the moment a commission has fixed the annual cost of getting business, and allowed it as an operating expense, and thereby pro tanto increased the per M [service] rate to which the company would otherwise have been restricted, that moment this cost, to that extent, ceases to be capitalizable or to have any effect on the rate base."

It may be true, as seems to have been the

view of the court in that case, that the principle does not ordinarily apply where there is no regulatory law. Clearly we think it inapplicable to the initial or formative period, when rates high enough to cover such expense would necessarily be 'excessive and are not charged. Accordingly we hold that, under the circumstances here shown, such expense should in part, but only in part, be regarded as a factor of going value.

In a large measure like considerations are applicable to what plaintiff designates as "training organization." Plaintiff does not at its own cost run a training school. Presumably it pays experienced employés, out of operating revenue, what, in the light of their skill and experience, their service is worth. No contract is shown obligating them to remain, and out of consideration for their training and experience to render service for less than it is worth. If it requires four inexperienced men to accomplish what three with experience can do, and if compensation is adjusted to efficiency, the result is the same. Rates to consumers are made to cover the cost, and, with the exception of the early formative period, they have been charged to and paid out of operating revenue, and such increment of value as may accrue is the normal fruitage of such revenue, and not of capital investment.

[23] We are unable to see how present economy of operation is an element of going concern value. It may be a consideration which should be weighed in ultimately determining what is a reasonable return. If we adopt, as a standard, reasonably prudent and economical operation, a suitable reward is thus provided for unusual competency and care, and a penalty falls upon extravagance and incompetency. Besides, the economy, such as there is, has been accomplished by means and agencies for which the consumers have paid, and for their continuance are asked to continue to pay.

[24] So as to plaintiff's credit. Ability to finance the enterprise under just conditions is but a normal attribute of a qualified utility corporation, and cannot be capitalized under the guise of going value. , Given its franchise, protected against competition, and permitted to charge rates which will net a reasonable return upon the value of its properties and upon an adequate working capital, it is only doing what is to be expected when it promptly discharges its obligations and thus maintains its credit.

[25] Some consideration, we think, should be given to what is designated "co-ordinating and unifying physical properties," for the reasons explained by plaintiff's manager. The real difficulty lies in the dearth, if not the absence, of evidence for an intelligent estimate. In a measure the item is subject to some of the considerations we have just discussed.

When we turn to consider the ultimate question, in point of fact we are impressed with the inadequacy of dependable data upon which to base any finding by computation. For direct evidence plaintiff relies upon the "study" or prepared "memorandum" of its able manager. While he exhibits so-called computations under different theories, no one is free from controlling factors resting on nothing more substantial than opinion, if not pure assumption or conjecture. He has had a somewhat varied experience in the electrical business, but he has never given special consideration to the subject or conducted any experiments or made or recorded observations, or in any way made such investigation as would qualify his opinions as scientific inferences.

Admittedly definite and dependable data touching some of the factors could have been recorded, from which fairly accurate calculations or estimates could be made; but for the most part this was not done, and we are left to reach a conclusion necessarily involving elements of great uncertainty. That his computations are not dependable is tacitly, if not expressly, conceded by plaintiff's manager, for he declines to accept the result of any one of them, and expresses a general conclusion which in respect to the computations is measurably arbitrary. Nor are we greatly assisted by the citation of other instances where, ex necessitate, action was taken upon data equally unsatisfactory. A conjecture is not greatly aided by repetition.

In the process of establishing a just rate base, the commission, in its order or findings of December 21, 1922, after allowing $322,617.50 (we have allowed $400,000) for organization expenses, said:

"But more is required for organization than incorporation fees and expenses. These are only part of the framework. There must be a managing and operating personnel; experience must be gained and records made, so that the needs of the customers can be understood, foreseen, and met. These are essential features in the task of getting going as a service concern; really a part of organization; but not in the limited sense in which the word is used by accountants. It is for the limited sense that the items of $206,430 and $117,187.50 were shown. The other part is considered in the study of business and property

development, in which the 'organization' of the predecessor companies in its wider sense does have a part. * * *

"From what appears in the record, it is clear that a large amount of money has been actually spent in making the successful service concern, and [also] upon, and because of, the nonoperative property. Our puzzle is to work out a fair allowance for the amount of such expenditure now represented in the service concern in its present successful operation. In other words, to find out how much of the expenditure not represented by tangible elements' has been energized in the service concern.

"As will be noted from what is hereafter said about nonoperative property, a large portion of this expenditure had to be made because of these nonoperative properties, and for this we do not make an allowance in the rate base, for this represents only the service concern. Taking into consideration the benefits resulting to the public, the difficulties of reorganization, credit conditions, and the result achieved, we are of the opinion that there has been energized, in the way of property development, at least $518,622.10, and in the way of business development at least $305,020." (Volume 1, pp. 73, 75, 76.)

While we may think the allowance too small, clearly there is here manifest no spirit of unfairness. Since then the enterprise has grown, and additions of considerable magnitude in the aggregate have been made to the physical properties. Apparently, however, consistent with a prudent policy of development, these additions have been gradual, and have at no time greatly outstripped existing demand. That being the case, the interest and other charges upon finished, but unused, physical plant have not been, and should not be, great. Provision was made by the commission for ample reserve to be set aside out of operating revenue for upkeep, maintenance, and retirement, and for all operating expense, which provision experience has shown to be equal to if not in excess of the need in some respects.

As already suggested, the current expense in recent years, at least, of attaching business, has been largely charged to and paid out of operating revenue, as was contemplated when the rates were established. In its set-up now plaintiff includes in annual operating expense an item on this account of over $35,000 (volume 1, p. 252), and in addition has grouped under "Miscellaneous" other items aggregating a very considerable sum which can be justified, if at all, only upon this account (volume 1, p. 259). It would seem, therefore, that in the main, if the rates were fully compensatory as they were intended to be, plaintiff's demand is now in part to capitalize expenditures which by agreement were not to constitute capital, and for which it has been reimbursed, and, if not fully compensatory, then in the most favorable view it seeks in effect to capitalize losses incurred in operation.

To conclude: We recognize merit in most of the elements urged for our consideration. But in the main the accruals to going value are during the formative period of the enterprise and the early stages of development. Plaintiff's experience and practice in making plant additions in recent years may be taken as illustrative and typical of a normal, economical construction program, after the enterprise is well on its way. The additions have been in response to demand, and have been but little in advance thereof. A comparatively short time intervenes between construction and compensated use, and upon completion the entire cost is added to the rate base. It is a natural growth. To meet accruing need, plaintiff made additions during the last six months of 1924 at a cost of $81,224, and it asks that this at once be added to the rate base; in 1925, $200,000, and the same procedure. Under such circumstances, the valid factors contributing to going value—interest, taxes, maintenance, cost of coordinating physical property, cost of attaching customers (the demand in part being preexistent), enlarging and training existing organization, and the other elements—must of necessity be comparatively small.

In view of the dearth of dependable data, for us to attempt a specific computation would involve a measure of pretense. We can only exercise our best judgment, in the light of all the circumstances in evidence, also considering the opinion testimony, and doing so we estimate the capitalizable going value at $1,500,000.

### Working Capital.

[26] Defendants' engineer estimates a reasonable allowance for working capital to be $564,445. He makes the estimate upon the basis of the inventory of materials and supplies on hand June 30, 1924, and the amount of what he refers to as two months' operating expenses. We do not find the specific items, and hence we are unable to determine what he regarded as a month's operating expense or the amount of the material and supplies on hand at the time stated. The method employed, he testifies, is common practice for estimating working capital. It is not correct to say, as argued by plaintiff, that such a method ig-

nores consideration of certain items which it contends should properly constitute elements of working capital. It is what may be denominated a straight line or general estimate of all elements.

Where, in the experience of engineers, such a rule has in the long run been found to be an approximately accurate measure, it may be resorted to in the absence of something better; but where, as here, there is direct evidence of specific needs for working capital, such a rule should be checked in the light of such evidence, if not rejected entirely.

[27] The plaintiff submits a tabulation (volume 1, p. 258) of what it contends are the items of needed working capital, amounting to $923,196, and it makes a claim for $950,000. One of the items is $51,750 for "necessary bank balances." Plaintiff necessarily carries accounts in numerous banks in the field of its operations, and we think the amount not unreasonable.

[28] In the same connection, however, we can see no substantial reason for allowing an additional $50,000 claimed for "contingencies." This, of course, is just an estimate, and the witnesses were unable to make any very clear explanation of the necessity for it. In a small part it covers petty advances made to officers and agents of the company to cover traveling expenses, but in the main such expenses are chargeable as operating expense for the current month, whatever may be the practice as to their entry upon the books, and to that extent they are covered by another allowance shortly to be considered.

We are unable to see why ordinary contingencies of operation cannot be taken care of out of operating revenue and the item of working capital to be allowed for that purpose, and in rare cases of extraordinary contingencies the $51,750 of bank balances may be temporarily resorted to. There is no contention that these bank balances must under no circumstances be impaired. Under the plaintiff's set-up, it is not a borrower from the banks; hence is under no obligation, as is sometimes the case with a heavy borrower, at all times to maintain a substantial credit balance in its checking account. It is quite inconceivable that any unregulated business concern, carrying the balance we have allowed, would at the same time carry an additional balance of $50,000 to meet small contingencies that may now and then arise.

Defendants concede that an allowance should be made for materials and supplies necessarily kept available for current needs, and therefore we allow $203,259 claimed by plaintiff on that account. We also allow the amount claimed for prepaid insurance and rent, namely, $22,422, and shop operations, namely, $3,578.

[29] Considering the present status of the property and business of the company, and probable future, we regard $19,820 as excessive for "deferred valuation and rate expense." Much of this work is done by regular employés, whose total compensation is charged and paid under other heads. We allow on that account $10,000.

Plaintiff estimates two months' operating expenses, exclusive of tax accruals, to be $187,463, and it contends for that amount. Just why it claims operating expense for two months, rather than some other period, is not entirely clear. With the exception of its irrigation customers, it bills for service at the end of each month, and accounts become delinquent if not paid within 10 days. In considering the plaintiff's need for operating fund, we may assume that it commences business upon the 1st of the month with its bills all paid, with the requisite materials and supplies on hand fully paid for, and with credit balances in the banks, aggregating over $50,000. If, therefore, it were to be assumed that operating expenses must be paid at the beginning rather than at the expiration of the month, the cash required could not exceed such expense for a period of more than 40 days. But operating expenses are not so paid in advance, and it is not to be presumed that all consumers defer payment of dues until the last day before delinquency. Business concerns do not ordinarily pay compensation to their employés either in advance or daily. Wages and salaries are usually paid at stated periods after the service is rendered, and in the purchase of supplies and materials a short period is granted for payment after billing.

Upon inspection of the classes of items making up the plaintiff's budget of expense, it will be apparent that payment of a considerable part of the expense is deferred, and deferred payments to plaintiff may be compensated in deferred payments by it. The large item of taxes is an outstanding illustration. It is true plaintiff, in part at least, excludes taxes from the estimate of $187,463; but mere exclusion is scarcely adequate treatment. Taxes in Idaho for any calendar year are payable, one half the latter part of December of such year, and the other half the latter part of June of the succeeding year. It follows that plaintiff may set up on its books as an operating expense for the month of January one-twelfth of the total taxes for the current year, but as a matter of fact it is not under the necessity of paying any part of such

tax until December, and then only one-half. The practical result is that at all times the plaintiff has in its hands funds collected as revenue, ranging from a minimum of 5 months tax accruals to 11 months. If we assume a tax accrual of $20,000 per month, plaintiff has on hand at all times in this account a fund ranging from $100,000 to $220,000.

[30] Upon the whole, when we give consideration to plaintiff's reasonable, actual needs, we are unable to see how under any ordinary system of conducting business an amount greatly in excess of one month's operating expense, as such expense is limited in plaintiff's set-up, can be needed to enable plaintiff promptly to meet all of its matured obligations.

Referring in this connection to suggestions in the record that the necessity for this fund could be entirely obviated by resorting to the unapplied retirement reserves, and using operating revenue ultimately intended for dividends and interest until it becomes necessary to pay it out on those accounts, this may be said: It is not of great importance how such funds are treated, or under what head they are considered. But manifestly, if, as is possibly the better practice, the unapplied retirement reserves are to be held intact, then, as appears to be the intent of the Idaho statutes and the purpose of the commission, interest on such fund is to be treated as a part of the reserve, and should have consideration in determining the amount required for retirement needs. Under that theory the unused reserve is constructively a part of the plant, and must at any time be added to the present value of the physical property in use, in order to maintain the assumed value of the rate base.

As to the part of the operating revenue ultimately applicable to the payment of interest and dividends, if, prior to such application, it is not used for expense of operation, but, as plaintiff seems to contend, is to be deemed paid to plaintiff on such accounts as soon as it is collected, then we must assume that in effect interest and dividends are paid monthly, and that consideration would have a bearing upon the rate of return. For convenience we adopt this latter view, and accordingly neither such revenue nor retirement reserve is presently given consideration.

Several items, aggregating a very considerable part of the total working capital claimed, as set up in the plaintiff's exhibit (schedule No. 15, volume 1, p. 258), have the same legal status. They are: Notes of consumers, $60,256; accounts of delinquent consumers (not covered by notes), $272,536; deferred irrigation accounts, $54,545; miscellaneous accounts receivable, $20,528; and reserve for uncollectible accounts, $22,961.

If we assume that plaintiff is entitled to receive interest and dividends monthly, and further that such interest and penalties as are collected upon these several items are returned as income, plaintiff should have whatever in fact may be a reasonable allowance for working capital to cover these accounts. But such allowance could not be made upon any other theory. The item for deferred irrigation accounts is illustrative. This simply means that, instead of billing at the end of each month for irrigation services, the billing for some of such service, at least, is, by agreement, deferred for from 1 to 3 months.

Plainly there is no inherent reason for classifying such accounts as "deferred," any more than there is, in other cases, for classifying accounts covering service for the first 10 or 20 days of each month. In neither case is the service paid for in advance, or immediately after it is rendered. The only difference is that in one case longer time is given for payment after the service is rendered than in the other. Dividends are payable only every 3 months, and interest only every 6 months. It follows, therefore, that the classification is somewhat artificial, and, as already stated, the claim has substance only upon the theory that interest and dividends are to be considered as payable monthly.

A high percentage of the delinquencies and delayed payments covered by these items is to be found in the accounts covering irrigation service, and is in a large measure undoubtedly due to almost unprecedented agricultural depression and optimistic promotion of irrigation projects. (Volume 2, p. 194.) It was in consideration of these conditions, which it was assumed would be temporary, that the commission made an allowance for working capital in excess of what it would have ordinarily regarded as reasonable. (Volume 1, pp. 76, 77.) It is clear from the record that conditions have changed and are changing. The delinquent irrigation load has been measurably reduced, and increase in the plaintiff's business is along the safer lines of domestic service of different types, where delinquencies are few and losses are rare.

As another consideration it is to be noted that, while for some of plaintiff's service payments are deferred, in other cases deposits averaging in excess of $60,000 are required in advance of service, and of these funds it has

the use. Upon the whole, we conclude that $650,000 is a reasonable amount for working capital.

## Depreciation.

Plaintiff's position is that as a matter of law there should be no deduction for depreciation, or, if some allowance is to be made, it should not exceed $438,734. Upon the other hand, one of the two witnesses testifying for defendants on the subject estimates depreciation at $3,086,091, and the other at $3,965,785. A problem so complex, and involving so large an amount, merits full consideration.

In the face of its contention that we must capitalize its property at its present fair value, and must deduce such value by inquiring first what it would now cost to reproduce the property new, when we come to adjust this measure to the property as we actually find it, plaintiff urges that we should adopt the theory of value for present use. In other words, because the property is in such state of repair that it is presently capable of rendering substantially the same service as a new plant, nothing should be deducted for depreciation, regardless of its age or the deterioration of any of its parts.

To illustrate: A pole with a normal life of 10 years, costing when installed 9 years ago $25.00, but if now installed new $35.00, we are to capitalize at the latter value, even though it will be worthless at the end of a year. Such a view would set us adrift. Under it the original installation of a used or inferior pole could be capitalized at the same value as a new or durable one, because of its temporary serviceability. If serviceability is to be accepted as having any substantial relation to standard of value, it must be understood as meaning something more than present efficiency or utility. Durability, including cost of upkeep and the need of renewal of parts, is a vital consideration. It may be conceded that the process of depreciation is not necessarily uniform or continuous, and when it has reached a certain stage its effect upon the value of the property as a whole may be neutralized by adequate upkeep and seasonable replacement of parts. It is entirely conceivable that the accrued depreciation of plaintiff's property as a whole is no greater now than it was 5 years ago, and that it will be no greater 5 years in the future. Assuming the useful life of a pole to be 10 years, if plaintiff constructed half of its line 15 years ago and the other half 10 years ago, and 5 years ago renewed the poles first set, and to-day renews the other half, it may very well be said that, everything else being equal, the accrued depreciation is no greater to-day than it was 5 years ago. But as compared with construction wholly new the value of the poles must in either case be depreciated 25 per cent. [31] And that is the precise question we have here: Not whether plaintiff's property is worth less to-day than it was at some other period of its use, but whether, as it stands, it has the same fair value it would have if it were wholly new. The moment a pole is set in the ground, the process of deterioration begins. To ask us to hold that after it has been subject to such process for a period of 5 years, it is as valuable as a new pole, because it will give service for an additional period without replacement or reinforcement, is to urge us to set aside reason. In speaking of the general practice in respect to the transmission and distributing units of a system, one of the expert witnesses for the defendants testified that ordinarily such systems, properly maintained, depreciate from the value new to the extent of 20 or 25 per cent., and are permanently held at substantially that level by maintenance and retirements. Whether this is a precisely accurate estimate of percentage we need not determine; but the truth of the general proposition is obvious. Repairs and replacements are not made upon new lines. They are not required until deterioration has advanced to a certain stage, or, owing to lapse of time and changing conditions, a substantial measure of inadequacy or obsolescence has been wrought.

In respect to its automobiles, plaintiff adopts a theory inconsistent with the one it urges for the balance of its property, but more in accord with reason. It computes the probable mileage of the car, and deducts from cost new in proportion to the mileage already used, making reasonable allowance for scrap value. In rapidity of deterioration, to be sure, there is a difference between an automobile and some other items of the plaintiff's property; but in principle they are the same, and if we compare the automobile as a unit with the plaintiff's entire system as a unit there is close analogy. Probably a car which has run 2,000 or 3,000 miles is quite as valuable for present use as a new car. Some of its parts wear out or deteriorate rapidly; as to others, depreciation, if there be any at all, is scarcely appreciable. By proper maintenance, and by seasonable renewal of parts from time to time, the life of the car as a usable instrumentality may be prolonged indefinitely.

[32] That some deduction must be made, we entertain no doubt. No useful purpose would

be subserved by reviewing the numerous cases, and we content ourselves with the citation of Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 S. Ct. 148, 53 L. Ed. 371, and the Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

[33] There remains the important process of relating the cost of the hypothetical new plant to the fair value of the old plant as it actually exists. Fair value implies a consideration of all factors which would be regarded as material in negotiating a sale and purchase of such property. Wear, decay, deterioration, obsolescence, inadequacy, and redundancy would all undoubtedly be considered as factors. It is suggested that obsolescence and inadequacy do not accrue, but occur. But in essence how do they differ from wear and decay? In either case the process is usually gradual, and ultimate withdrawal from use of the affected unit or device is just as abrupt and just as much an occurrence in the one case as in the other. Suppose that in the progress of the art there becomes available a device which is somewhat less expensive and somewhat more efficient than the old, but that the differences are not so great as economically to justify immediate substitution. Can it be said that the value of the old is in no wise impaired by obsolescence, or that in appraising it we could fairly value it as its present cost, when that is in excess of what the new and more efficient device would cost?

So, in respect to inadequacy, changing and growing conditions may be such as to make it appear inevitable that in a short time a unit will become inadequate and must be retired. Would it be contended that, though it may still be adequate, its fair present value could be unaffected by the fact that it must soon be scrapped? We have a concrete illustration: While asserting that from the standpoint of location, design and capacity, the plant is in good condition, plaintiff's manager testifies that it is expected business will grow to such an extent that within the next five years existing power plant units, representing an investment of $500,000, must be retired for inadequacy. If within that short period these units must be scrapped for inadequacy, how can it be said their present fair value is greater than it would be if their physical deterioration had reached such a stage as to make their retirement necessary within the same period?

The extent of such depreciation at any given time is often difficult to determine, but nevertheless it is quite as real as in the case of wear or decay. Hence reserves, with equalized annual accruals from operating revenue to cover such impairment of value, which takes place gradually, but is given record recognition only from time to time when the depreciation of a unit becomes so complete that it must be retired. Manifestly, if we ignore such impairment, we not only place a value upon the property which it does not in fact possess, but, with accrued reserves fully covering the impairment, we capitalize that which has been constructively withdrawn from use and that for which plaintiff has been fully compensated. Chesapeake & P. Tel. Co. v. Whitman (D. C.) 3 F.(2d) 938.

[34] In respect to a complex system, some parts of which are older than others, and general depreciation is wanting in uniformity, undoubtedly information procured by actual inspection is preferable to the so-called straight line or percentage method. But at best the ultimate findings must to some extent involve estimates and opinions, and in some particulars nothing better than estimated averages, based upon probabilities, are available.

Defendants' witnesses, with such information only as they acquired from a partial inspection and from the records and the history of the system, relied in a measure upon the straight line method. For that reason plaintiff contends that the estimates so made must be rejected, and the estimates made by its witness, based upon a detailed inspection, must be accepted as the only competent evidence before us. But if, for the reason stated, we were to reject the testimony of the defendants' witnesses, the alternative would not follow. Plaintiff's inspection was not made with a view of estimating all of the factors which we hold must be considered, and accordingly the estimate of its witness, based upon such inspection, was not made with reference to the standard we hold to be applicable.

The method pursued and the theory employed are explained by its chief engineer. (Volume 1, pp. 11 to 17 and 37 to 45.) By himself and through his assistants he made a detailed examination, for the purpose of ascertaining what repairs and replacements should be made, either presently or in the immediate future, and the conclusion reached that such repairs and replacements could be made at an aggregate outlay of $438,734 was adopted as the full measure of depreciation. While he states that with this outlay the property could be put into a condition as good as new, or could be made as valuable as new, it is plain from all of his testimony that he had in mind the standard of value now urged by

the plaintiff, namely, value for present use—present serviceability or efficiency. For example, we quote (page 37):

"Q. I understood you yesterday to say in respect to that, Mr. Rankin, that it was 97 per cent. of the value it would have if it were entirely new? A. Yes; 97 per cent. as valuable in service. * * * Q. Now one of the simpler units, with which I would be more familiar, transmission line, for instance: When you made this investigation with a view of determining the present value of that unit, as I understand, you went out along the line and examined the structures as you went? A. Yes. Q. Now, if you found a pole five years old—that is, one that had been installed five years—how would you treat that in your inventory and appraisement? A. Unless the pole required reinforcing within a three-year period we considered it the equivalent of a new pole."

When pressed from another angle for an explanation of what he meant in saying that a purchaser would give as much for the existing plant as for a new one, he seems to have made it clear that the mental comparison was of the present system as a going concern with a newly constructed system before business was attached. (Volume 2, p. 45.) But going concern value plaintiff asks to have considered separately as a very substantial factor.

The assistants to this witness, who, in giving their testimony on direct examination, employed substantially the same language, must, though not particularly interrogated, have intended the same qualified meaning.

When analyzed it is clear that plaintiff's estimates are of only a part of the elements that must be taken into account, and, even if accepted as correct in respect to the elements considered, it would furnish an inadequate measure of entire depreciation. That being the case and the determination of the reproduction cost now being futile unless such cost is related to the property as it actually exists by ascertaining and deducting therefrom the total depreciation, manifestly the plaintiff's case must fail for want of sufficient proof, unless we can resort to other evidence.

[35] The only other direct testimony upon the subject is that of the defendants' witnesses, Kopelman and Fletcher. The objections to their testimony go to its weight rather than its competency. Both are trained engineers, with a considerable experience in valuing public utilities and well informed in respect to the various theories more or less commonly resorted to in making such valuations. While he did not make a detailed inspection for the purpose of appraising the present physical condition of each item of plaintiff's property, from frequent general inspections on the ground and from the history of the system and the records and reports submitted by the plaintiff, Kopelman is familiar with the property as a whole, and has adequate knowledge of the location of all of its various units, their character, approximate age, and general condition. Fletcher has little knowledge gained from an inspection in the field, but it was competent for him to submit an appraisement made upon the assumption of the correctness of data found in the records and reports of plaintiff, the exhibits put in evidence by it, and supplementary facts and data put in evidence by the defendants. To be competent, it is not necessary that an expert witness have personal knowledge of all the material facts.

But, aside from that consideration, the real dispute is not in respect to facts which only a minute inspection upon the ground would disclose. Both of these witnesses expressly concede that the properties are well maintained and in good operating condition. They also concede that as to certain parts of the property there is no appreciable physical deterioration. Plaintiff could scarcely hope that a minute inspection would result in more favorable concessions. The real issue is more fundamental. Plaintiff contends that by the expenditure of $438,734 the properties can be put into an operating condition as good as new, and if any allowance at all is to be made for depreciation it should not exceed this amount. Conceding the premise, but challenging the conclusion, defendants' witnesses assert that there are factors of depreciation which do not affect present operating efficiency, and that in their appraisement minute inspection would be of little if any assistance. See Lyndon, Rate-Making for Public Utilities, pp. 30, 31.

If we again resort to the automobile for a concrete illustration, they in effect say that, owing to considerations wholly extrinsic, a new automobile, though never used and physically unimpaired, may by lapse of time depreciate in value; and, a fortiori, if used, it will lose value, though kept in perfect operating condition, and though many of its parts do not wear or physically deteriorate. Like considerations apply to plaintiff's properties as a whole. In determining this depreciation they adopt substantially the methods used by the plaintiff in depreciating its automobile account. It does not employ an experienced mechanic to take a car to pieces and estimate the measure of wear or deterioration of each

part. It resorts to a percentage or straight line standard, based upon an assumed mileage life.

Crude and inaccurate though it may be in specific cases, it is a working rule which in the long run probably approximates reasonable accuracy. The method is not to be withheld from other units of plaintiff's property merely because there is less experience from which to deduce a standard, unless something better can be suggested. If the factors of depreciation urged by defendants are real, we are under the necessity of measuring them in some way. Undoubtedly plaintiff's automobiles depreciated quite as rapidly in the earlier period of their operation as they do now, but they were not to be carried indefinitely at cost, merely because its experience was insufficient in the earlier years, to warrant satisfactory general deductions of accrued depreciation. Its experience could be supplemented by the experiences of others and the prognosis of those who are qualified by special knowledge in the art.

Upon analysis of the record, it is found that plaintiff's real position is not that defendants' witnesses are relatively incompetent, but that qualification is impossible. But if, as we have already held, the factors which the witnesses attempt to appraise are material elements of depreciation, the whole theory of valuation upon which the case is presented must be rejected as impracticable, unless such depreciation is susceptible to appraisement.

In a large measure the same uncertainty attends the setting up of a depreciation reserve, sometimes referred to in the record as retirement expense reserve, an account which is intended to anticipate and provide for the very contingencies under consideration. Forecasting the future, plaintiff's manager estimates that revenues aggregating $240,000 annually will be necessary to cover such contingencies. Little actual experience was available when this account was first set up, and owing to changing and changed conditions the experience now available is only of remote value. Undoubtedly forecasting the useful life of certain elements of a plant involves a measure of speculation. But where there are numerous units of the same character, under familiar principles the uncertainties of an intelligent forecast are greatly reduced. An experienced engineer might confidently estimate the life of a pole line, but hesitate to express an opinion respecting the life of any specific pole. Probably no one would venture to compute with approximate certainty the mileage life of a specific automobile of 1926 model. And yet plaintiff deems it not unreasonable

to resort to the average mileage life of numerous cars of different models for a working rule. In a lesser degree this principle of averages is applicable to plaintiff's generating plants and other classes of property, where there are numerous units of the same character.

[36] It is also urged by plaintiff that any deduction for accrued depreciation of any kind is in necessary conflict with the sinking fund theory established by the Idaho statutes (see section 2473) and adopted by the commission. For several reasons we are unable to concur in this view. Under this theory it may be conceded that if, when the plant is new, a precisely adequate reserve is set up, and the reserve is faithfully administered and legitimately applied, the unexpended accrued portion thereof might at any time be taken as a measure of accrued and uncompensated depreciation; and if both the fund on hand and the plant were considered together as constituting the investment there would be no depreciation.

[37] But we have not such a case. We are asked to take the plant in the condition in which we find it, exclusive of any reserve, and, putting a fair present value upon it, determine whether the schedule of rates under consideration will net a fair return upon such value. Our inquiry looks to the future, and not to the past. If, as is suggested, we were to assume that the retirement reserve provided for in the order complained of was inadequate fully to cover accruing depreciation, that fact would not warrant us in closing our eyes to such depreciation as has actually taken place. We could not draw upon an accumulated depreciation reserve to supplement inadequate current income, nor can we compensate for past losses out of current income, or by giving a fictitious value to the rate base. Board P. U. C. v. N. Y. Tel. Co. (Apr. 12, 1926) 271 U. S. 23, 46 S. Ct. 363, 70 L. Ed. 808; Galveston Electric Co. v. Galveston, 258 U. S. 388, 395, 42 S. Ct. 351, 66 L. Ed. 678; Georgia Ry. Co. v. R. R. Com., 262 U. S. 625, 632, 43 S. Ct. 680, 67 L. Ed. 1144.

But if the rule were otherwise, and if we were privileged to make equitable adjustment for the past, it is to be observed that, when the retirement reserve was set up, the commission was dealing with a property, parts of which were old; some of it had been in use for at least 20 years (for illustration see volume 2, p. 235), some of it for shorter periods, and other units were approximately new. The older units had been built by competing companies, with consequent duplication, and most of them had for a period been operated by receivers. It is not to be assumed that, in

setting up the reserve, the commission intended to enable plaintiff to recoup past losses, if any, and to restore used property to its value new. Normally such a reserve would cover accruing and not accrued depreciation. It is gauged with reference to the future, not the past, and if it was so gauged in this case, and the accruing funds had been properly applied, theoretically the plant would now be subject to all the depreciation, as compared with the new property, which existed at the time the reserve was set up.

Moreover, if we were to adopt the reserve as presumptively a correct measure of depreciation accruing after the order was made, it would be necessary to find that the depreciation now accrued is in excess of what it was then, for plaintiff has not applied the reserve to the maintenance or replacement of property embraced in the plant, the value of which we are considering. On the other hand, in harmony with its apparent view that the funds thus accruing belong to it absolutely, to be used as it sees fit (volume 2, pp. 296, 297), it has applied most of them, at least $872,714, in "retiring" uncompleted and useless property acquired by it from its predecessors, none of which was ever used by it, or included in the values of its useful properties by the commission. Exhibit 31, volume 1, pp. 456, 457; volume 2, pp. 268–270. In short, if the position it took in 1919, and now maintains, that the reserve so set up was and is necessary to compensate accruing depreciation, it would seem to follow as of course that during the time which has elapsed there has accrued a net uncompensated depreciation of $872,714.

Some light may be gotten by an approach from a different angle. As a standard we are taking the value of a new plant, designed and located to supply existing demand, and that which may be reasonably anticipated in the near future. Every possible element is included, intangible and tangible. The value is of a complete new going concern, with business fully attached. Had we in fact such a plant, is it conceivable that, with an adequate allowance and expenditure for every species of ordinary maintenance and repair, it would be necessary, under any conditions that could reasonably be anticipated, either in the art or in the field, to retire for fully accrued inadequacy, obsolescence, or redundancy any substantial amount of the property within five years? But, as to the plant we actually have, plaintiff urges that, in addition to adequate provision for maintenance and repair, it is necessary to provide at the rate of $240,000 annually for such retirements, and its manager seems to be of the opinion that it will be necessary within 5 years to make retirements on one account amounting to a maximum of $500,000. (Volume 2, p. 283.) Were we to adopt these views without qualification, they would tend rather strongly to confirm the deductions of defendants' witnesses.

In the main we have been discussing considerations touching obsolescence, inadequacy, and redundancy, and features of the record in respect thereto having some tendency to support, in part at least, the so-called straight line or percentage method employed by defendants' witnesses. Putting these aside for the moment, let us consider briefly depreciation in the narrower sense—pure physical deterioration. Of course, if, as seems to be suggested in some of the questions put to the witnesses and in plaintiff's argument, property is not to be deemed depreciated where by expenditures for repairs and the replacement of worn or defective parts it can be put into a condition as good as new, then we could rarely, if ever, find physical depreciation. But, if our task is to put a fair value upon the property as it actually stands, then the condition of the property at the time of the inquiry is to be considered, and not the supposed condition in which it may be after certain expenditures shall have been made upon it. In other words, a typewriter or a meter which has had considerable use is not equal in value to a like instrument just received from the factory; and a building which will soon need a new roof covering, or a new floor, or a fresh coat of paint, is not of the same fair value as a similar building wholly new.

As suggested in some of the questions, it may be conceded that there is generally little physical deterioration in concrete dams, copper conductors, and glass insulators; like considerations would apply to a building constructed of concrete, with tile roof and floors, and imperishable doors, sash, and casings. But if we assume, without proof, that some of plaintiff's buildings are so constructed, the several classes of property do not constitute the plant. We have already explained the basis upon which plaintiff estimated depreciation in transmission poles: "As good as new," unless decay has advanced to such a stage as to require stubbing within 3 years. This is a large account. We assume the same method was employed in respect to the distribution systems, another large account.

As we understand the record, plaintiff has approximately 40,000 customers, to whom it measures current. Its meter account exceeds $500,000, approximately $370,000 of which was for instruments in existence as far back

as 1919. Upon this entire account plaintiff computes a depreciation of $1,362, and that is for "cost of replacing defective meters" only. Is there no wear or deterioration generally in such instruments? Because, after use of 10 years, a watch or clock keeps perfect time, is it as valuable as when new?

Plaintiff fixes a depreciation of only $8,-598 (and that for cost only of replacing defective instruments) on its transformers, an account totaling approximately $800,000; $500,000 as long ago as 1919. Upon equipment at approximately 50 substations and transformer stations, aggregating approximately $1,200,000, or approximately $600,-000 for such property in the plant in 1919, it computes a depreciation of but little over $12,000.

The office equipment account, while relatively not large (approximately $100,000), is highly illustrative of the theory upon which plaintiff computes depreciation. The number is not given, but there must be many typewriters; in the depreciation account (16–B) frequent reference is made to the need of revarnishing or other repairs of typewriter tables and chairs. But, with the exception of a few cases where overhauling is needed, typewriters are not mentioned. Clearly the theory is that an old typewriter is as valuable as a new one, unless there is immediate need of overhauling, and in such case the difference in value is measured by the cost of overhauling. Of this particular item the lay mind may be assumed to have some intelligent conception, without direct testimony upon the subject. And we must presume that the same rule of appraisement was used in respect to the larger accounts, outside the range of common knowledge, such as power plant equipment, power plant buildings, fixtures and grounds, aggregating approximately $3,000,000 as early as 1919, and now about $5,000,000.

Weighing all considerations, we estimate depreciation to be $2,000,000.

## American Falls Unit.

[38] One of the points in controversy is referred to throughout the record as the American Falls unit. It seems that, in 1922, plaintiff's power plant at American Falls consisted of dams and other hydraulic works, in connection with which there was installed a single generating unit, having a rated capacity of 3,000 k. w. Contemplating the installation of at least one additional unit, with a rated capacity of 6,000 k. w., it entered into a contract with the Utah Power & Light Company, by the terms of which it engaged upon certain considerations to construct an additional or third unit, which also was to have a rated capacity of 6,000 k. w. The contract was executed in November, 1922, and by it the plaintiff agreed to construct the third unit, install flashboards on the existing dam, and design and construct a transmission line from American Falls to Pocatello of sufficient capacity to carry the power developed by the three units. The work was to be completed by January 1, 1924, and the plaintiff was thereafter to operate the unit as a part of its system, and to deliver to the Utah Company the current developed by it, plus any additional power it might at any time have available at its American Falls plant in excess of the demands of its consumers, within the range of its ability and up to the requirements of the Utah Company.

In consideration of the plaintiff's undertaking, the Utah Company was to pay, as compensation or rental for this power, $15,-000 per year, plus an amount computed by taking a certain percentage of one-half of the cost of installing the two new units, including cost of flashboards. As a further compensation the Utah Company agreed that, in so far as it might have hydraulic power available, it would furnish the same to the plaintiff in case of accident by which the plaintiff might require power to be delivered at Blackfoot or Pocatello. It is further stipulated that the contract should be regarded as liquidating any existing accounts between the parties for power theretofore interchanged, etc. The term of the contract was to be for two years, with provisions for renewals and cancellation which are not presently material.

It appears (volume 2, p. 255) that, under the terms of the contract, plaintiff receives from the Utah Company $109,416 per annum. The expense charged against this return, for maintenance and operation, is $11,797. (Volume 2, p. 246.) The total cost of the unit, as estimated by the plaintiff's engineer, is $629,-444. It will thus be seen that the return is extraordinarily large, if the $629,444 be regarded as plaintiff's entire investment. Its position is that the unit has no place in our present consideration, and that therefore its cost is to be deducted from the rate base, and the revenue derived from it is not to be considered as any part of gross income.

The $629,444 is the bare cost of the generating unit, and includes nothing for the dam, flowage rights, or, in short, for any part of the investment in the basic hydraulic plant or the transmission line, although obviously this investment is essential to the service for which the compensation is paid. The whole of the basic investment, without deduction, is charg-

ed against consumers in the set-up we have considered for rate-making purposes. Likewise the entire cost of maintaining and operating the general hydraulic works is charged against and deducted from gross revenue. The whole plant is operated as a single entity, and in apportioning cost of operating and maintaining the unit there are elements of uncertainty, in estimating which we are necessarily dependent largely upon the judgment of plaintiff's agents. And, it may be added, the unit is not made to bear its ratable share of all costs. The two new units are housed in the same structure, but, instead of dividing equally the cost of maintenance and operation plaintiff charges against the system the whole thereof, after deducting only such an amount as it deems to be the excess over what it would cost if there were but the old and one new unit.

We are unable to see how plaintiff's contention can be sustained. Assuming that there is some benefit accruing to consumers from the so-called "stand-by" service rendered by the Utah Company, the value of which it is difficult to measure, it is nevertheless true that this is but an additional consideration from the Utah Company for current, to the generation of which the basic plant and transmission line contribute. The question of ownership is not highly material; it may be conceded that plaintiff is the owner of all the property, the basic plant as well as the three generating units to which it ministers. Nor is the use to which the Utah Company applies the current, or the territory where it is used, a controlling consideration. Whatever view may be taken upon these points, if plaintiff's position be granted, it still remains true that the plant, the entire cost of which is charged to consumers, is not being used wholly for their benefit. If the plaintiff were to rent a part of a valuable building site owned by it in the city of Boise, the entire value of which is charged as a part of the rate base, must it not account for the rents as income? Or if it itself uses such site for its own private purposes, must it not likewise account for the rental value as income?

If in the case under consideration the basic plant and the three generating units and the transmission lines had all been constructed at the same time, would it be contended that one unit could be withheld from the public service and used for private profit without an equitable apportionment of the entire cost? Presumably because it has no present need therefor, plaintiff now leases a part of its general office building at Boise to the traction company, and accounts for the rentals received as income. Could it take the same space, and, at its own expense, make necessary alterations and additions and install fixtures, and thereupon lease the property for merchandising purposes, and decline to account for any part of the revenue as compensation for the use of that part of the investment included in the rate base?

We are not without appreciation of the plausible reasoning by which plaintiff defends the position taken. Consumers are not injured by the use of the dam or other basic investment. But neither would they be in the hypothetical cases just referred to for illustrative purposes. They get a benefit from the stand-by service of the Utah Company. But in turn that company gets a like benefit from the plant charged to the consumers. The arrangement is mutually beneficial; neither party undertakes to guarantee any stated amount of such service, but each agrees only that in case of need it will furnish such current as it can spare. It does not follow that, if this unit had not been constructed, it would have been necessary for plaintiff greatly to increase the rate base for consumers by providing large additional facilities for stand-by service. It had received from and furnished to the Utah Company such service, and there is no apparent reason why the arrangement could not have been continued. Such a reciprocal arrangement is not uncommon between companies occupying the same territory or adjacent fields, settlement being made upon a statement of account for current furnished and received. And then there is the possibility of connecting the American Falls plant with other units of plaintiff's system.

But, regardless of what might or might not have been done, we are unable to escape the conviction that, where the entire cost of a property is charged to consumers and the property is beneficially used for a private purpose, they are entitled to credit for the reasonable value of such private use. The standard by which such value should be measured here is not free from doubt. Defendants' contention is that the unit should be considered an integral part of the system and treated accordingly. But in the view we have taken the construction of the unit was in advance of normal public need for service, and was to a degree an independent enterprise, involving a measure of risk not incident to normal additions to a utility system. In that view the plaintiff is chargeable only with the value of the use it thus makes of the property included in the rate base for consumers.

Upon the whole, we conclude that a fair adjustment for present purposes would be to exclude the cost of the unit from the rate base, and divide the net income by crediting the system with $22,000. While we are unable to make an accurate computation, this amount will probably approximate a fair compensation for the use of a ratable share of the basic investment, including cost of maintenance and operation, and will leave to plaintiff 12 per cent. on its investment, over and above such costs, to cover interest and the risk of the enterprise.

#### Merchandise Account.

[39] In connection with its business of generating and furnishing to consumers electric current, the plaintiff keeps stocks of and sells merchandise consisting in the main of electrical appliances and supplies. This merchandise is usually displayed and sold in the room, or at least in the building, where the other business is transacted, and in a very large measure the merchandising is done by the plaintiff's general officers and agents. Plaintiff contends that this business is no part of its public utility service, and therefore withholds entirely the accounts in respect thereto. By reason of the close relation between the two lines of business, and the fact that they are carried on in the same buildings and to a large extent by the same agents and the same facilities, it becomes necessary, of course, in separating the accounts, to apportion costs and expenses covering rentals, facilities used in common, and agencies having to do with both lines. At best such task is not free from difficulty, and, where there are necessarily present considerations of self-interest, the difficulty is greatly increased.

But, in view of the facts disclosed by the record, we do not deem it necessary to determine to what extent, if at all, such merchandising can properly be regarded as a part of the public utility business, or subject to regulation by the commission, nor to determine whether or not costs and expenses have been equitably apportioned. It appears that for the 5 years from 1920 to 1924, inclusive, which are the years covered by the pertinent exhibits (volume 1, pp. 261 and 452), the annual volume of such merchandising ranged from approximately $484,000 down to approximately $285,000; the amount in 1924 being approximately $336,000. There is no uniform trend in volume. The average capital per annum employed ranged from about $288,000 down to about $208,000. Here also there was no uniform trend. The net profit per year ranged from approximately $42,000 in 1920 to

$19,000 in 1924, there being a continuous, though not uniform, trend downward. According to the accounts, in 1923 the average capital employed was about $250,000, and the net profit was a little over $21,000. In 1924 the average capital employed was a little over $270,000, and the net profit a little less than $19,000. It will therefore be seen that it makes no substantial difference whether the account is or is not included in our rate set-up. Accordingly we exclude from consideration the whole subject.

#### Summary of Rate Base.

While the account numbers run from 1 to 40, there are in fact no items under Nos. 4, 8, 11, 14, 15, 17, 22, 23, 26, 27, 30, and 34. The following is a tabulation of the amounts as we have found them, under the other accounts, of property in existence December 31, 1919 (inclusive of accounts 1, 2, 3, 37, and 39, in full):

| | |
|---|---:|
| Account 1 | $ 400,000 |
| Account 2 | 14,688 |
| Account 3 | 201,046 |
| Accounts 5, 6, 7, 9, 10, 12 | 156,288 |
| Accounts 13, 24, 25 | 4,930,200 |
| Accounts 16, 18, 19, 20, 21 | 286,418 |
| Account 28 | 2,376,000 |
| Accounts 29, 31, 32, 33, 35, 36, 38, 40 | 4,007,880 |
| Account 37 | 107,209 |
| Account 39 | 52,696 |
| Oxbow plant | 150,000 |
| Total | $12,682,425 |
| Additions, January 1, 1920, to June 30, 1924 | 6,367,321 |
| Working capital | 650,000 |
| Going value | 1,500,000 |
| Grand total | $21,199,746 |

Deduct:
| | | |
|---|---:|---:|
| American Falls Unit.. | $ 629,444 | |
| Depreciation | 2,000,000 | |
| | $2,629,444 | |
| Rate base as of June 30, 1924.... | | $18,570,302 |
| Additions last six months of 1924 (to be considered only in connection with subsequent operation) | | 81,228 |
| Additions 1925 (for same limited purpose) | | 200,000 |

While in reaching this conclusion we have seemingly adhered strictly to the reproduction cost theory, we have not been unmindful of the fact that it is not to be used as a mathematical formula. The hypothetical new plant must be stepped down to the plant as we actually have it, and such standard as "cost new" furnishes is subject to modification by divers factors, such as obsolescence or antiquation, redundancy, relative inefficiency or unsuitability for the purpose used, depreciation, going value, and other considerations

which have a bearing upon value in the minds of prudent and intelligent men in the negotiation of a sale of such property. All these we have taken into account, and have discussed some of them specifically. As to price levels, conditions are somewhat different from what they were when the commission made appraisement. It was then more or less generally thought that prices were abnormally high, owing to war inflation, which was regarded as of temporary duration. About that time there was an apparent downward tendency, which, however, turned out to be short-lived. But since that time there has been so little variation, and there is so little in the record in respect to probable changes in the future, that we do not feel warranted in assuming a substantial increase or decrease in construction costs. We therefore adopt the computed result as a reasonable estimate of fair value.

### Rate of Return.

No useful purpose would be subserved by collecting the numerous cases where this subject has had consideration. The general range of allowance has been from 6 to 8 per cent., with comparatively rare instances of higher or lower rates. Each case is to a degree affected by its own distinctive circumstances. In addition to bare compensation, we are, of course, to recognize that there is a measure of risk. In all investments there is risk. It is involved, as well, in mortgage and other loans; otherwise, the private borrower would not have to pay double the rate paid by the government.

Under the circumstances, the element must here be held to be relatively small. The utility serves a wide territory, generally agricultural, with many small urban communities. The basic industries are highly diversified agriculture and stock raising. These are permanent resources; they are not exhausted by use. Water resources for irrigation are apparently abundant, and great investments have been made in the construction of irrigation works. It is immaterial that some of these enterprises may not have been financially feasible, and will entail loss upon the investors. The systems have been constructed, and are enduring resources for use, whatever may ultimately turn out to be their reasonable capitalization.

Electric current has come to be recognized as one of the prime necessities of our modern life, for numerous uses. The experiment in general heating has been unsuccessful, but that is a negligible factor. There is apparently a limit to the economical feasibility of irrigation pumping, but such current as for

that reason may be released from that service plaintiff seems confident will be required for other demands more fully compensatory. The bulk of plaintiff's service is to small consumers, for lighting purposes and other multiplying uses in the home, and for many small commercial and individual needs—insuring permanency and freedom from violent fluctuations in aggregate demand; and according to the testimony the expectation is of an expansion along these lines, rather than for purposes more hazardous and uncertain.

The experience of plaintiff's predecessors is without present significance. That was a period of speculative promotion, inadequate financing, duplication, and unrestricted competition. Under the system of public regulation, so long as plaintiff is able and willing to render adequate service, it is protected against competition from a like utility, and desultory competition from other sources can hardly be formidable.

[40] Evidence of the strength and safety of plaintiff's investment under these conditions is found in the experience of the last few years. The territory has passed through or is passing through an unprecedented depression, so notorious as to be a matter of public history, and is referred to by some of the witnesses in the case. But while farming and stock raising were prostrate, banks in great numbers were closing their doors, and the more substantial business concerns were marking time, the utility was apparently but little affected. Its volume of business grew, and it was able to meet its obligations out of increasing revenue. No deserved credit is withheld from its management, by saying that its basic strength inheres in the fact that it sells for cash a prime necessity, to innumerable small consumers, for a diversity of uses, and that it operates under laws which protect it against the vicissitudes of competition and any popular demand for unremunerative rates. True, there is no technical guaranty of permanent success; but, assuming the feasibility of the enterprise, assurances of the prime factors of such success are very real. Depreciation is compensated, and the possibility of loss through deflation in plant value is counterbalanced by the possibility of inflation; and over against the contingency that for a given period a schedule of rates may in practice yield a return less than what is determined to be reasonable may be set the contingency of an excess.

Small temporary investments or loans are scarcely comparable. Besides, as between the rate paid by the ordinary borrower and the

net return to the lender, there is generally a substantial spread. The bank must bear the expense of banking, and in the loan business there are commissions and other expenses, including cost of collecting interest, and generally of service in seeing to it that the security is not jeopardized through waste or defaults in the discharge of taxes and other paramount liens. We are here considering a permanent investment of a very considerable magnitude, and a net return to the investor after every expense is paid, including the costly service of the Bond & Share Company; a net return, too, as to which at least a portion of the burden of federal taxation has been discharged. And, as we have seen, a further consideration, not without substance, is that the return is paid every month, instead of semiannually or annually.

[41] We would have difficulty in believing that, with reasonable assurance of honest and efficient management, an investment of that character, with a 7 per cent. return so paid, would be unattractive. At least we are unable to conclude that under such circumstances rates yielding a return of 7 per cent. or over, so paid, would in any proper sense be confiscatory.

### Gross Operating Revenues.

Aside from the question whether sundry interest items and income from merchandising and the American Falls unit should be included, there is agreement between the parties in respect to gross revenues derived from past operations. They differ in their estimates for 1925 and in their predictions for 1926. Exclusive of the disputed items referred to, gross revenues for 1923 aggregated $2,494,778, and for 1924 $2,682,850.

Since the hearing, at the suggestion of the writer, to avoid the uncertainty always involved in estimates, by agreement the parties have put into the record an exhibit showing the total operating experience for 1925 (see exhibit filed August 4, 1926), from which it appears that such revenues amounted to $2,692,515. It will be remembered that the rates prescribed by Order No. 939 became effective March 1, 1924, so that the revenues for the last 10 months of that year and for the whole of 1925 may be assumed to reflect the result of such rates.

In harmony with the conclusion hereinbefore stated in respect to the American Falls unit, $22,000 is to be added on that account to revenues for 1924 and for succeeding years. Interest received upon consumers' delinquent accounts amounted in 1923 to $13,221, and in 1924 to $12,026 (see plaintiff's brief, pp. 279,

280), and for 1925 $13,758 (see recent exhibit filed after hearing). For the reasons hereinbefore given, the merchandising account is excluded.

Bearing in mind that no revenue was received from the American Falls unit prior to 1924, we therefore find that the gross revenues received from operating properties to be as follows:

| | |
|---|---:|
| 1923 | $2,507,999 |
| 1924 | 2,716,876 |
| 1925 | 2,728,273 |

In forecasting the future, and concretely in estimating probable revenues for 1926, the parties differ substantially. Plaintiff's estimate is $2,736,000, which it will be seen is but $18,000 increase over 1925 (taking the revenue for the latter year with estimate made by plaintiff, at the time of hearing, for November and December), whereas the smallest actual annual increase theretofore, beginning with 1920, was $74,128. Explaining, plaintiff suggests the loss for 1926 of the Gem Irrigation load, carrying a revenue of approximately $80,000. But, as bearing upon the actual effect of such loss, if it has occurred, it may be noted that this is a service for which plaintiff contends the rates prescribed by Order No. 939 are inadequate; and, besides, we are to bear in mind that nearly all the bad or uncollectible accounts arise out of irrigation service, and of these accounts that of this district appears to be the worst.

In the four years prior to 1925 plaintiff charged off as uncollectible approximately $500,000, largely in irrigation accounts (plaintiff's brief, p. 292), and by reference to Exhibit 31, sheet 22, it will be seen that in 1924 plaintiff charged off as uncollectible notes, warrants, and accounts of this district, for the period beginning with 1920, aggregating $112,300. Clearly, under such circumstances, book revenues do not truly reflect actual receipts, and our ultimate concern is to determine actual net receipts. If this load is lost, there is for consideration also the fact that the current thus released will be available for other, possibly more lucrative, uses; and if we set up on one side the total earned revenue of $80,000, against that we must set up on the other side at least the "out of pocket" expense of rendering the service and the uncollectible part of the charge. While these latter considerations properly come under the head of operating expense, they are noted as illustrative of the complexity of the real problem underlying the mere form of book accounts.

Mainly relying upon what is termed the

trend method—that is, projecting a curve based on actual experience of several years—defendants' witness estimates the gross income for 1926 at approximately $2,997,000, exclusive of the merchandise account, $20,000, and the American Falls unit, $103,000, which are also excluded from plaintiff's calculations. While the method cannot be held to be incompetent, the conditions have been so wanting in uniformity, even if we limit consideration to the latter period of operation, and there are so many variable factors, that it cannot be followed as a formula, or its result accepted with confidence.

### Operating Expenses.

As set up by the plaintiff, the operating expenses (inclusive of maintenance and retirements) for 1923 aggregated $1,430,626; for 1924, $1,574,508; for 1925 (estimated for the last 2 months), $1,611,728, and for 1926 (forecast), $1,640,000. (Volume 1, pp. 252–254.)

Defendants' accountant exhibits a statement showing such expenses (without depreciation) to be, for 1923, $1,230,626, and for 1924, $1,381,306. (Sheet 7 of Exhibit 31, not in printed record.) Or, as adjusted, to be for 1923, $1,176,723, and for 1924, $1,302,824. (Sheet 15 of Exhibit 31, not in printed record.) He also shows an estimate for 1925 of $1,465,577, and for 1926, $1,542,210. (Volume 1, p. 455.) In these estimates for defendants there is included the expense of the American Falls third unit, which in the view we have taken is to be deducted.

The actual experience for 1925 is now shown, by the exhibit recently put into the record, to be as follows: Total operating expenses, as set up on plaintiff's books, and subject to adjustment as hereinafter explained, $1,587,765.

In its forecast for 1926, it will be noted that the plaintiff's estimate is approximately $88,000 in excess of that of defendants, or, excluding from the latter the expense of the American Falls unit, $100,000 in round numbers. In projecting the budget to cover 1926, defendants' accountant has carried forward, in a large measure, plaintiff's book accounts, including all items in respect to which there is controversy, particularly the very considerable item of "expense of supervision." The two set-ups differ in structural form in certain particulars, so that without full analysis comparison is impracticable. In so far as concerns results, apparently there is but little variance touching most of the principal heads; and, counsel having not made analysis, we assume that the substantial controversy involves only the items discussed in the briefs. These may be referred to as (1) supervision and special services; (2) regulatory commission; (3) taxes; (4) retirement expense; (5) uncollectible bills; and (6) miscellaneous general expenses.

### 1. Supervision and Special Service (Electric Bond & Share Company).

In its set-up of operating expenses, plaintiff charges an item of approximately $53,000 per annum to be paid to the Electric Bond & Share Company of New York for what is denominated supervision and special service. Capitalized at 7 per cent., it represents an investment of approximately $750,000 and is about equal to 57 per cent. of all other administrative and general office salaries. In addition thereto, payment is also made to the Bond & Share Company for other special services, and reimbursement is made for all traveling expenses.

[42] There is little force in the preliminary suggestion, made by counsel for plaintiff, that in the rate-making proceedings the commission allowed an item on this account. Touching the amount allowed, or the showing made before the commission, we are not advised; it may be conceded that some allowance should be made, and we are concerned only with the amount thereof. Besides, the view of the commission, whatever it may have been, is not controlling here.

Further reference is made to the fact that in one of the tabulations presented by Hassan, a witness for the defendants, the item is recognized as an expense of operation. (Volume 1, p. 455). But Hassan was put forward merely as an accountant, to exhibit data gathered from plaintiff's records and other sources; upon cross-examination he expressly stated that he himself did not make the calculations shown in the exhibit referred to. (Volume 2, p. 526.) The arrangement under which the payment is made to the Bond & Share Company is evidenced by a formal contract, executed in January, 1923. (Plaintiff's Exhibit 21.)

[43] In respect to business policy, generally a court will not substitute its own judgment for that of the managing officers of a utility company. This, of course, where the officers act independently and with a view of promoting the interests of the company, which normally are not opposed to the interests of the consumers. Manifestly the rule is not applicable where there is common control of both the utility company and the party with whom it contracts. While there are here some circumstances suggestive of such control, the evi-

dence upon the subject is fragmentary, vague, and unsatisfactory.

The plaintiff's manager explains in detail the nature and scope of the service received under the contract. (Volume 2, pp. 224–227, 268, 280–319. See, also, volume 1, pp. 397, 407.) As already indicated, the amount paid constitutes a relatively large item of expense. The witness Evans testified on the subject to the effect that sometimes analogous results are obtained at a comparatively small cost. (Volume 2, pp. 587–589.)

If it be assumed that the contract was reasonable when it was entered into, it would seem that there must be a diminishing need for certain classes of service covered by it. Plaintiff's contention is that the properties have become fully co-ordinated, and that it is now a well-designed system, in excellent condition. No major construction projects are in contemplation, and it is to be inferred from the testimony that neither radical improvement in the art nor substantial increase in efficiency is to be expected.

[44] But, aside from the question of the reasonableness of the compensation as a whole, there is the further question whether it is all chargeable against the consumers. Any service looking to better management, greater efficiency, reduction of investment, or increase of net operating return is for their benefit, and is properly chargeable to expense of operation. But it would seem that a very considerable part of the service covered by the contract and rendered by the Bond & Share Company has to do with financial matters, in respect to some of which we are unable to see how the consumers have any obligation. It may very well be that, by reason of its standing in the financial world, by its sponsorship, the Bond & Share Company strengthens plaintiff's credit and enables it to get cheaper money and to sell its securities advantageously. (Volume 2, p. 315.) But if, during the period of construction, it charges 8 per cent. on money used for that purpose, and through such special agency it actually secures the money at 6 per cent., the service accrues to the benefit of the promoters and stockholders. Why should the service be charged to the consumers? So of the period following construction, the obligation of the consumers is to pay rates which will yield a fair return on the investment; but if, by the advantageous sale of securities through the agency of the Bond & Share Company, the money can be gotten at a rate below such standard, they would seem to be concerned neither in the benefit nor in the burden.

[45] Appropriate disposition of the item is not free from great perplexity, but on the whole we decide to allow it, and take it into consideration as bearing on other factors of the general problem. If, as contended, to the service thus paid for by the consumers is to be attributed a very substantial part of the economies of operation for which credit is claimed, such economies are not again to be charged to them under other heads. And if, through it, plaintiff is able to obtain cheap money, that fact, too, may be considered as bearing upon the rate of return.

2. *Regulatory Commission Expense.*

This item is intended to cover cost to plaintiff of all proceedings before the Public Utilities Commission. The amount thereof is, in the nature of things, highly contingent. The amount charged to this account by the plaintiff in 1924 was $17,000. For the year (immediately following the commencement of this suit, July 24, 1924) covering the last half of 1924 and the first half of 1925, it charged $31,000. Assuming a ratable spread of the $17,000 over the entire year of 1924, it would seem that the charge for the first half of 1925 was $22,500, as against $8,500 for the first half of 1924. It is to be borne in mind that there is no contention that generally a charge to this account involves an actual expense corresponding thereto incurred during the period the charge is made. Part, if not most, of the charges constitute withdrawals from a suspense account, which we do not stop to explain.

In the set-up for 1925 (recent exhibit) plaintiff now charges, under this head, $50,-000. The stipulation made a part of the exhibit shows that $7,000 of that amount was for expense in proceedings before the commission in that year, $13,000 for expense of like proceedings in prior years, and the balance, $30,-000, represents a part of plaintiff's expense incident to this suit incurred in 1925. In its estimated set-up for 1926, plaintiff charges for this account $30,000.

The numerous routine matters and smaller complaints before the regulatory commission are handled by general officers and regular employés of the company, whose salaries and compensation are covered under other expense heads, and hence are not to be considered here. In the larger controversies, special legal, engineering, and other services must be employed, and such expense may be of considerable magnitude, where the hearing is extensive; when such proceeding will occur no one can foretell. Where the plaintiff is clearly in the wrong— that is, where, if the proceeding were in a court of equity, costs would be taxed against

it—it would seem it ought not to be reimbursed.

[46] The expensive task of making a full inventory and appraisement of the property has long since been accomplished, and large controversies in the near future would hardly seem probable. We are therefore inclined to the view that $10,000 or $12,000 ought to be sufficient, if we were considering only future needs. But a very considerable amount accruing from valuation and other attendant proceedings is still carried in suspense, which plaintiff should be able to amortize. Considering all the circumstances, we allow $22,000.

The matter is in a measure for ultimate adjustment by the commission, and we adopt this amount for present purposes only, in an endeavor to reach a solution which will fairly reflect the normal or ordinary operating expense of the company, assuming a reasonable spread of the burden of extraordinary expense of this character beyond the year in which they happened to occur.

### 3. Taxes.

All taxes of every character amounted for the year 1923 to $211,696, for 1924 to $249,-592, and for the year 1925 to $322,853. (Volume 1, p. 252; and for 1925 see recent exhibit.) Hassan, defendants' accountant, exhibits figures for 1924 $7,345 greater; but it is to be borne in mind that at all times he includes the American Falls unit, for which plaintiff deducts an estimated amount from the total. His estimates for 1925 and 1926 are exclusive of income tax, and hence are not comparable. For 1926 plaintiff's estimate is $342,500 (volume 1, pp. 252–254), and defendants for all property, including the American Falls unit, but exclusive of income tax, $273,639 (volume 1, p. 455). Comparison of Hassan's estimate for 1925 with his estimate for 1926 shows an increase in the latter of a little over $13,000.

As appears from a sheet attached to the recent exhibit, a forecast of the future is difficult. One federal tax provision has recently been repealed, and by another, if not changed, the future burden will be slightly increased; but it will be noted that, for reasons stated by plaintiff's manager, he estimates an increase in 1926 over 1925 of only $20,000, as against the highly abnormal increase of $73,-261 for 1925 over 1924.

### 4. Retirement Expense.

The basis of this item is to be found in the structure set-up by the commission in its order of December 19, 1923. With this, if no other feature of the order, plaintiff is apparently content.

19 F.(2d)—37

As hereinbefore stated, the item has a direct relation to depreciation, and that is also true of maintenance. In the long run the two in combination may be said to offset or neutralize depreciation. Admittedly there is no clear line of demarcation between them. In most cases it is a mere question of the magnitude of the expenditure; the smaller expenses of keeping the plant up to standard being charged to maintenance, and the larger ones to retirement. To equalize and spread the burden of the large items, a reserve out of operating revenue is set up, to which resort is had from time to time as there is need.

Recognizing the difficulty of segregating the two classes of expenses, the commission, by its order referred to, provided that a certain amount of operating revenue should be allocated in a lump sum for both purposes, and the residue thereof remaining each year, after paying such expenses as the company should charge to maintenance, should be placed in the retirement reserve, which, with such interest as might accrue thereon, should be held to cover retirements. The amount set up by the order for both purposes was $380,000 for the year 1922, and it was to be increased from year to year, in the manner prescribed in the order, to cover net additions to capital accounts.

This plan has been followed, with the result that in 1924 the amount going into the retirement was $205,000, and for 1925, as now shown by the recent exhibit, the same amount, $205,000. Plaintiff's estimate for 1926 is $240,000. While the increase would seem to be relatively liberal, as compared with former increases, it would not be out of the range of reason to allow $230,000, and this we do.

### 5. Uncollectible Bills.

Plaintiff's claim is for $50,000, and in defendants' set-up $23,100 is allowed. There is little direct, if any, reasoning in the record, so far as we have discovered, in support of the plaintiff's specific estimate; that is, it seems to be a pure estimate, and not a deduction. Admittedly the "charge-off" for any one year, and particularly for the year 1924, furnishes no criterion; and owing to changed conditions the experience of several years cannot be said truly to reflect the probable future. From the plaintiff's standpoint, the principal testimony is that of its manager. (Volume 2, pp. 236, 237, 288.) It appears that, with the exception of a small amount, these uncollectible bills have heretofore arisen from irrigation delinquencies, but at this time they have been practically all "wiped out," or charged off, and it is necessary to provide only

for future accruals. It is not anticipated that future losses will be so great.

Incidentally it is to be noted that a charge-off, or a charge out of the active accounts, of a bill, does not necessarily imply an actual loss. The claims still exist, and collections on account thereof are sometimes made. (Volume 1, p. 288.) There has been a period of extraordinary deflation, affecting agriculture and irrigation, as well as other business in the territory, but in respect to that plaintiff's manager testifies that there has been a marked change, with reason to anticipate continued improvement for some time. (Volume 2, p. 288.)

For the defendants, their accountant testified that the total losses for uncollectibles upon all accounts, exclusive of irrigation, for the years from 1920 to 1924, inclusive, averaged $10,600 annually, or, as we compute it, about one-half of 1 per cent. on gross revenue from such sources. The gross revenue from the irrigation load, as set up on the books of the company for the same period, was $2,014,801, or an annual average of $402,960. Upon consideration, the accountant estimated that, as against one-half of 1 per cent. upon all other accounts, 2½ per cent. on irrigation accounts, taken as a whole, would be a reasonable allowance for uncollectibles, making a total of approximately $21,000 on all accounts of every character. For 1926, he raises this estimate to $23,000. In that connection, he notes the contention of plaintiff that the Gem district is to be cut off from service after 1925, and, if so, the irrigation uncollectibles will be greatly reduced, for, as he shows, the charges against it for the five-year period referred to aggregate $464,190, whereas it has paid but $233,390.

However that may be, it would seem that, with the experience the plaintiff has now had, and the improved and improving financial conditions of the territory, it should, with the exercise of reasonable care, be able to guard against excessive losses in the future from this source. We think $30,000 should be sufficient for uncollectibles.

6. *Miscellaneous General Expenses.*

The account is made up of numerous items of divers kinds, shown in detail for certain years by Exhibit 42 (volume 1, p. 259). Some of them are clearly chargeable, others should be excluded, and still others present doubtful considerations of law, measurably dependent upon the particular circumstances which are not in all cases fully disclosed. To discuss the items in detail is impracticable. Moreover, by reason of the fact that the account covers expenses which are not otherwise classifiable, no confident prediction can be made that the items of one year will recur in another. We allow $50,000.

Summary upon Probable Net Income.

While we do not consider them wholly apart from previous history, we are inclined to think the experiences of 1924 and 1925 are more likely to reflect the future than do those of former years. During that period we have fewer important changes in the physical plant, the rates fixed by the order in question were in force, and the American Falls unit was in operation. For 1924, if we add to the agreed gross income of $2,682,850 interest on delinquent accounts and $22,000 for the American Falls unit, we have a total of $2,716,676. Applying the same mode of computation to 1925, we have for the year a total gross income of $2,728,273.

Turning now to plaintiff's set-up of expenses for 1924 (volume 1, p. 252), there is no substantial controversy in respect to it, except as to some of the items discussed in the foregoing paragraphs numbered from 1 to 6, inclusive. All expenses, exclusive of the six classes, amounted to $826,142. There is no dispute concerning the tax and retirement items in that set-up, and we have as a matter of law allowed for supervision. These three items amount to $506,918. Of the other three classes, "Miscellaneous General Expenses" includes some items that are not chargeable, and both "Regulatory Commission" and "Uncollectibles" represent merely allocations of a more or less arbitrary character, and do not all reflect the accruals under these heads for that year.

Applying, with some modification to meet the conditions, what in the foregoing paragraphs we have adopted as the normal for these accounts, the three would aggregate approximately $102,000, which is about $139,000 less than the sum of the corresponding items in plaintiff's set-up. Deducting $139,000 from the total, $1,574,508, we have, as covering the entire actual expense for 1924, $1,435,508. This, deducted from gross income, $2,716,876, leaves a balance of net income for 1924, $1,281,368. Pursuing the same course in respect to 1925, we have: Gross revenue, $2,728,273; operating expense, $1,509,595; net operating return, $1,218,678.

From these computations, and taking into consideration the fact that extensions of the physical property were made in 1925 in the amount of $200,000, which we may assume were in response to a substantial existing demand, and which should therefore contribute to the gross revenues for 1926, the improbability of another abnormal increase of taxes to

absorb so large a part of normal increase in revenue, and other circumstances bearing upon the probability or improbability of increased revenues and increased expense, we estimate the net revenue for 1926 to be approximately $1,225,000. It should be noted here that, if the schedules of rates, fixed by the commission in its Order 939, for irrigation service, water heating, air heating, and nonprofit institutions, are held to be invalid, and the rates proposed by plaintiff go into effect, it estimates an additional revenue both gross and net of approximately $249,000. (Plaintiff's Brief, p. 282.) These schedules are now to be considered.

## Part II.

### Special Schedules.

As a distinct ground for relief, plaintiff assails, as being arbitrary and beyond the authority conferred upon the commission by the state statutes, certain rate schedules established by Order No. 939. They are Nos. 6 and 6-A, Water Heating; 7, Air Heating; 8, Irrigation; 9, Charitable Institutions, etc. Back· of the specific objections is a general contention that the commission did not have the power to disapprove plaintiff's tendered schedule No. 7, and its later schedule No. 8, and establish the rates, said to be of its own creation, embraced in Order No. 939.

[47] Plaintiff's first proposition is that, under the provisions of the state law, rates, whether put out by the utility or the commission, must be just, reasonable, and nondiscriminatory; neither the utility nor the commission has power to establish any other system. As a statement of a general principle, this proposition is upon all hands conceded. The difficulty is in construing and giving it application in a specific case. We do not understand that plaintiff contends that under it rates for all services must be uniform, for in its proposed schedules it classifies service, and not only assigns distinct rates for each class, but graduates rates within the class. Nor do we understand it to contend that in respect to a particular service, considered by itself, the rate must be fully compensatory, for, in discussing the power of the commission in respect to schedules proposed by the utility, it expressly concedes that, if such schedules as a whole will yield more than a fair return upon a proper valuation, the commission can reduce the rates in all or some of such schedules "if not below the cost of a particular service." The rule thus recognized is discussed in Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; No. Pac.

Ry. Co. v. No. Dak., 236 U. S. 585, 598, 604, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Banton v. Belt Line R. Corp. (May 25, 1925) 268 U. S. 413, 45 S. Ct. 534, 69 L. Ed. 1020, and other cases. [48, 49] We are not clear as to the intended meaning of plaintiff's further contention that "the right to initiate a policy in rate making inheres in the company [utility], not in the commission," and that "the company has a wider power and discretion than the commission." It may be conceded that the company has the right to "initiate"—that is, propose for approval—a schedule of rates, and that as between alternative rate structures equally just and reasonable the company may select that which it chooses, and further that unless, when such schedule is proposed, the commission takes action in compliance with the statutes, the proposed rates may, in most cases, become automatically effective. But, except as to form or theory, what power does the utility have which is not possessed by the commission? It is conceded to be the duty of each to fix only "just, reasonable, and nondiscriminatory rates." If this statutory declaration has any definite legal import, there is but a single standard for valid rates, whatever may be their origin, and within the law the ultimate decision, in case of disagreement in respect to matters of substance, would seem of necessity to be with the commission. If, as plaintiff concedes, the commission may within legal limits reduce all or some of the rates proposed, in every real sense the reduced rate so fixed is "initiated" by it. The commission may not, for merely extrinsic considerations, interfere with managerial policy, but managerial policy very often has a direct reaction upon rates, and in respect to it the commission must exercise some control, if it is fully to discharge its responsibility in administering the declared legislative policy.

[50, 51] Rate schedules involve a complexity of considerations. As a whole, they must yield a reasonable return on the investment. A relatively low rate may yield a larger aggregate net return than one that is relatively high. Rates need not be uniform, but, with rare exceptions, each should be above the cost of the particular service. A particular rate may be reasonable from the standpoint merely of cost (including investment); but, if it is prohibitive, because in excess of what the consumer can afford to pay—that is, in excess of its value to the consumer—it may be unreasonable. If it is the duty of the commission to see to it that the rates, both as a whole and for each particular service, are just to the utility and reasonable for the consumer, and non-

discriminatory as between consumers, it must have the power, not only to fix the rates for each class, but to classify. This power the statutes abundantly confer, and the commission may exercise it, either upon the initiation of the utility or of its own motion.

Section 2415 requires schedules to be filed by the utility, but further provides that nothing in the section "shall prevent the commission from approving or fixing the rates, * * * from time to time, in excess or less than those shown by said schedules." Sections 2417 and 2427 recognize that the commission has the same power in respect to classification as it has in respect to rates. In section 2429 it is declared that "nothing in this section shall prevent the commission from revoking its approval [of the schedules proposed by the utility] at any time and fixing other rates and charges. * * *" Section 2450 provides that the commission is vested with power and jurisdiction to "supervise and regulate," and "to do all things necessary to carry out the spirit and intent of the provisions of this chapter." Section 2451 provides that, "whenever the commission, after a hearing had upon its own motion or upon complaint, shall find that the rates * * * or classifications * * * are unjust, unreasonable, discriminatory or preferential, * * * or * * * are insufficient, the commission shall determine the just, reasonable, or sufficient rates, * * * classifications, * * * or contracts to be thereafter observed * * * and shall fix the same," etc.

Section 2452 is as follows: "The commission shall have power, upon a hearing, had upon its own motion or upon complaint, to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract or practice or any number thereof, or the entire schedule or schedules of rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices, or any thereof, of any public utility, and to establish new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts or practices or schedule or schedules in lieu thereof."

[52, 53] Upon the other hand, it is to be said that, while under these and other provisions of the statutes the commission has a responsibility calling for the exercise of a wide range of power and discretion in respect to both rates and classifications, its function is purely administrative. Within constitutional limits it is for the Legislature to declare the general policies of the state, and for the commission to give them effect. The commission cannot initiate public policies of its own, or invade the field of merely managerial discretion, left by the Legislature to the utility.

[54] The Legislature has declared that rates shall be reasonable, just, and nondiscriminative, and has clothed the commission with full power to see that such policy is carried into effect. In determining whether a schedule conforms to these requirements, it must act upon the facts and be governed by considerations intrinsic to the service, and cannot act out of respect for public policies, however wise they may seem to be, which the Legislature has not prescribed. As in substance was said in Southern Pacific Co. v. I. C. C., 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283, it is without authority to disapprove a rate intrinsically just and reasonable, and substitute another which in itself is, in a legal sense, unjust or unreasonable, merely because it would be a wise policy so to do, or because a utility has so conducted itself as to be estopped from being entitled to a reasonable compensation. See, also, Springfield G. & E. Co. v. Barker (D. C.) 231 F. 331; I. C. C. v. Delaware Land, etc., 220 U. S. 235, 31 S. Ct. 392, 55 L. Ed. 448; I. C. C. v. Union Pacific Ry. Co., 222 U. S. 541, 553, 32 S. Ct. 108, 56 L. Ed. 308; U. S. v. Ill. Cent. Ry. Co., 263 U. S. 515, 44 S. Ct. 189, 68 L. Ed. 417; Nor. Pac. Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. Ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1.

In the light of these principles, we consider the particular schedules:

I. *Charitable and Other Nonprofit Institutions—Schedule 9.*

[55] The schedule prescribes a discount of 33⅓ per cent. from normal rates in favor of hospitals, fraternal organizations, commercial clubs, and benevolent, religious, or eleemosynary institutions. However commendable the motive, the commission cannot be held to have the power to make such reduction. If it be assumed that, for reasons underlying the exemption of property of these organizations from taxation, the Legislature might legally authorize such a discount, it has not conferred such authority. Its only declaration is that the rates shall be just, reasonable, and nondiscriminatory. Service to these consumers costs as much as the same service to other consumers, and it is equally valuable. No economic reasons are assigned for making the distinction, and we find none. The institutions are, for the most part, maintained for the public welfare, and to a large extent are supported by contributions from public spirited citizens, but after all these are purely extrinsic considerations.

**II.** *The Other Four Schedules Named in the
Heading.*

These have to do with rates for the heating of water, used mainly, as we understand, for domestic purposes, for air heating, and for pumping water for irrigation purposes. In some respects they present similar legal aspects.

**(a)** *Irrigation.*

To encourage the use of electric current for irrigation, the plaintiff's predecessors made attractive rates, and in many cases term contracts stipulating such rates were entered into with irrigation companies and districts, and, under circumstances which it is unimportant to detail, with some alterations these rates and contracts were carried down to the time Order No. 939 was made. It may be assumed that the prevalence of what may be referred to as low rates thus established was one of the inducements leading to the installation of expensive pumping plants and the reclamation of arid lands by the farmers.

In the earlier years it seems to have been assumed that the demand for irrigation, being seasonal, would affect only a by-product; that is, current required for other purposes at other seasons of the year, but for which there was no use during the summer months. In the course of time, however, owing to the increased demand for both irrigation and other uses, and the overlapping of the irrigation and heating seasons, the diversity of use proved to be incomplete, with the result that the demand during the irrigation season greatly exceeded that for other seasons. The subject is discussed at some length by the commission in its earlier orders and findings, reference being made particularly to No. 873, dated December 21, 1922, and its order and findings No. 929, dated December 19, 1923.

Briefly it may be said that, taking cognizance of the conditions referred to, and holding the plaintiff in a measure responsible for encouraging the building up of the irrigation business upon the basis of low rates for service, and further holding that rates fully compensatory would be economically prohibitive—that is, would exceed what the farmers could afford to pay—and that the exaction of such rates would be ruinous to the irrigation industry and the investment therein, the commission held that upon 13.25 per cent. of the valuation of the plaintiff's entire property, or $1,542,095, it was not entitled to a "full return," and accordingly computed a return of 5 per cent. on this amount and 7 per cent. on the balance of $14,640,284 of the plaintiff's investment. In explanation of the 13.25 per cent., and as one of the reasons for

denying plaintiff a full return, the commission, in its order of December 21, 1922, said: "The total demand of all classes of service in August, 1919, was 27,090 k. w. The total demand in December, when no irrigation load was on, was 23,500 k. w.—an excess of 3,590 k. w. wholly used for irrigation in the summer, but for which no use had been developed at other seasons. This represents 13.25 per cent. of the total peak demand for that year, which was energized only during the irrigation season, or, roughly, for half the year. This does not affect the amount of the rate base, but it does mean 13.25 per cent. of the rate base was, as of the valuation date, not entitled to a full return, because it was not fully energized; the amount of return to which it is entitled being a question for the rate study."

We need not here stop to consider plaintiff's criticism of the foregoing reasoning or conclusion of the commission, for under this branch of the case it complains, not so much of the rate of return on investment, but of the specific rates for irrigation service as fixed in Order No. 939, made more than a year later.

[56] In its proposed schedules Nos. 7 and 8, which were rejected by the commission, plaintiff made no distinct provision for irrigation demand, but set up rates for all power uses alike, including irrigation, classifying the service under high, medium, and low voltage. Some changes were made by the commission in the specific rates proposed by it, but in point of structure this schedule was adopted in Order No. 939, and was thus recognized as sound in principle for all power service, including irrigation demand not otherwise provided for. But in a special irrigation schedule (numbered 8) in Order No. 939 the commission directed that all users of power for irrigation purposes during the preceding year (1923) should, to the extent of such use, continue to receive service in the future at the same rates, contract or scheduled, as were charged during that season.

We find no valid intrinsic reasons for such a classification, and besides the record seems to show want of reasonable uniformity in the rates thus continued in force for the old consumers. In the absence of other explanation, we must presume that the order was made upon the assumption that the rights of the old consumers and the reciprocal obligations of the plaintiff were in a measure governed by contract, or were affected by some principle of estoppel. But in making the schedule the commission was limited to the administration of the statutory policy that rates are to be

just, reasonable, and nondiscriminatory, and that is the extent of our present consideration. If by reason of valid contracts or estoppel certain consumers had vested rights, such rights would not necessarily be affected by a schedule of rates fixed in harmony with the statutory policy; nor could they be enlarged by a schedule out of harmony therewith.

[57] Until properly abrogated, valid contract rights may be enforced, regardless of schedules, and, if by deception consumers were induced to make expensive installations, they have their remedy. In the absence of such rights, there would be no basis at all for the classification. We are satisfied that schedule No. 8 rests upon purely extrinsic considerations, and cannot be sustained.

What bearing such holding may have upon rates that may lawfully be charged for irrigation service we do not fully consider. Plaintiff seems to assume that, upon the setting aside of a rate fixed by Order No. 939, the rate set up in one of its proposed schedules will automatically go into effect. But attention is called to section 2499 of the Idaho Compiled Statutes, expressly providing "that no public utility shall *raise* any rate, * * * or charge or so alter any classification, contract, * * * or regulation as to result in an increase * * * under any circumstances whatsoever, *except upon a showing before the commission and a finding by the commission that such increase is justified.*" Granting that unreasonable contract rates to be charged by a utility may be abrogated under the police power of the state, lawfully exercised, can such abrogation be accomplished without a hearing, after notice to the parties in interest, and a finding by the commission that the proposed increase is justified? Seemingly in point is Wichita R. & Light Co. v. P. U. C., 260 U. S. 48, 43 S. Ct. 51, 67 L. Ed. 124.

(b) *Water Heating.*

[58] Two schedules were set up by the commission for water heating—Nos. 6 and 6-A. The first is applicable to heaters installed prior to March 1, 1924, and expires by limitation March 1, 1927. The other applies to installations made after March 1, 1924. The first establishes a rate of six-tenths of a cent per k. w. h., and the other one cent. In all other details the two schedules are identical.

For considerations analogous to those discussed in respect to the irrigation schedule, and for the further reason that the rate is not substantially compensatory, we hold schedule No. 6 to be unwarranted in law. The insufficiency of the return under 6-A is not so clear but at best it does not approximate full compensation, and in view of the close relation of the two schedules, and the anomalous condition which would result from striking down No. 6 and permitting 6-A to stand, it is thought the two must go together.

(c) *Air Heating.*

[59] For intermittent use, within narrow limits, electric heating appears to be economically feasible, but not so for continuous general use in house heating. Upon that point the parties are agreed. But because plaintiff's predecessors built up an open-air heating business, particularly in one locality, the commission held that customers whose premises are equipped for this kind of service "should not be denied the use of surplus power at reasonable rates." Accordingly it established a schedule of rates (No. 7) available only to existing installations and applicable only to such surplus power as plaintiff might have over and above its requirements for other purposes. Taking cognizance of the overlapping of the irrigation and heating demand in the spring season, it limited the right to require service for heating at the scheduled rates to the period between September 30th and the 1st day of the following April, and imposed an additional charge for such service at other seasons. The schedule is made up of what is termed flat rates; that is, a prescribed amount for six months' service, ranging from $24.05 for such period to $217.10, depending on the load in k. w.

We are convinced that the rates are insufficient to cover bare operating costs, and for that reason the schedule is held to be invalid.

CUSHMAN, District Judge (concurring).[1] The suit is one to enjoin rates fixed by the Public Utilities Commission of Idaho for electric energy which the plaintiff contends are confiscatory and unreasonable. Three orders of the commission are involved, No. 873, No. 929, and No. 939. While, in the main, I concur with the findings of the majority of the court, I am unable to do so in certain of them, nor in certain of the conclusions reached. The dispute involves the rate base, the probable income, probable expense, and rate of return. The court will not consider the reasonableness of the rates, as it is a legislative, rather than a judicial question. The fact that the commission found 8 per cent. reasonable, and then prescribed a 7½ per cent. rate on part of the rate base and 5 per cent. on the remainder, is not conclusive as against the

---

[1] This case was decided after a final hearing without application for an interlocutory injunction. After the decision of the Supreme Court on February 21, 1927, in T. L. Smith et al. v. Louis J. Wilson et al., a decree was entered by Cushman, District Judge, and not for the three-judge court, in conformity with his concurring opinion.

prescribed rate—the question being: Are the prescribed rates so unreasonably low as to be noncompensatory and therefore confiscatory, rather than the determination within the range of rates which may be reasonable, of what would be the most reasonable? The reasons given and decisions cited by the majority are conclusive upon this question.

### Rate Base—Lands.

The taking of testimony commenced in this case in September, 1925. The case was finally submitted in March, 1926.

In Order No. 873, made by the commission in December, 1922, fixing the rate base, the commission said:

"There is the fact of the service investment having what might be referred to as a 'steady job' for a long term to be given consideration. It is true, and the record discloses, that the cost of like elements had largely increased above that in effect when some of the property was purchased; but that fact did not increase the number of dollars the utility owners had put into the service property, nor was it a matter of which they could actually take advantage, because they could not remove their property from public service and sell it, so as to obtain the advantage of the higher prices. This was one of the conditions which the utility accepted when it devoted its property to public service; and to offset this it has the permanency of business and protection against destructive competition we have above mentioned.

"The Idaho Power Company has urged that its rate base should measure 'present value.' By this term it has seemed to mean what its property would cost if the prices prevailing as of the valuation date were applied to it. This does not seem to us to be either fair or sound. If the principle were accepted by us, the result would be that, as current price levels lowered, the rate base of the utility would be subject to reduction. This would produce a factor of uncertainty, which would most certainly adversely influence future financing operations; for, even where the utility had in good faith made heavy investment with which to meet the service needs of the public during a time of high prices, as this company has done, a lowered price level thereafter would wipe out part of the investment so made. Naturally investors would be slow to put their money in a field where a low price level, temporary in its nature, might wipe out part of the investment. The investment in public utility service ought not to be judged as a temporary matter. It is made for the purpose of rendering service over a long term. One of the difficulties that public utility com-

panies have confronted has been the element of uncertainty; uncertainty of how much it would be allowed to earn on; uncertainty of what rate of earning it could depend upon. So far as may be practicable, we think uncertainty should be avoided, and that investment, when reasonably and prudently made, should be accorded a full measure of recognition, which would be neither inflated nor depressed by conditions which are in their nature temporary.

"In other cases we have followed this idea, using average prices over the period from 1913 to 1916 for the study of property placed in service prior to 1917, and the actual costs of property installed after that time. This results in somewhat appreciating the property which was bought prior to 1917, at times when the price level was below the average of the years 1913 to 1917, which appreciation, however, is a reflection of a prolonged condition of higher price level, and for that reason fair to both *the utility and the public*. The Idaho Power Company came into possession of the previously constructed property in 1916."

It will be seen from the foregoing that the commission refused to consider reconstruction costs in fixing the rate base. In this the commission was wrong, and, while its effect may not have been to entirely destroy the rate structure, it did destroy the strength of the presumption that the rates fixed were compensatory, and left that question to be determined upon a clear preponderance of the evidence; the burden being upon the plaintiff to establish their noncompensatory character.

### Lands.

The plaintiff's appraisal of the lands, exclusive of overhead and interest during construction, aggregates $234,069; with interest and overhead, $273,647. Defendants' appraisal is $66,808, to which it added interest, making a total of $70,609. While the defendants concede plaintiff's right to a year's interest on the land accounts, they properly exclude any other overhead charge on account of the lands.

### Power Plant Lands.

As to the power plant lands, the plaintiff's testimony is more persuasive. Defendants' witnesses, in appraising these lands, refused to consider the value attaching to them because of their suitability to power plant uses. In this they were wrong. Every use to which lands may be put has a bearing upon their value, with the possible exception of sovereign uses, such as forts. The value of the power plant lands, deducting $4,000 on account of

the farm at Horseshoe Bend, without interest, I find to be $95,062; with 8 per cent. interest for one year, $102,666.96.

### Transmission System Lands.

Regarding these lands, while I am of the opinion that $25 an acre, at which plaintiff's experts appraise desert lands, is shown to be excessive, yet on the whole there is a decided preponderance of the evidence that defendants' appraisal of $6,601 for land necessary to cover 800 miles of transmission lines is a decidedly inadequate allowance. It has been pointed out that defendants' engineer has appraised about 300 miles of transmission line lands for the lines built since 1919 at over $50,000. No explanation has been offered of the discrepancy. For this item I find there should be allowed $72,125, which includes interest.

### Substation Lands.

The plaintiff's total valuation of the substation lands is $32,040; the appraisal of the defendants' engineer, $22,597. On this question there is no such a decided preponderance of evidence in plaintiff's favor as to overcome the testimony in support of defendants' appraisal, except in the case of the Twin Falls site. At least $1,801.44 should be added on account of this latter item. This makes a total which I find should be allowed for these lands $24,398.44, which includes interest.

### General Office Lands.

Plaintiff concedes defendants' appraisal, except as to overhead, which, as stated, was properly rejected. The total for these lands, therefore, should be $12,980, which includes interest.

### Store Department Lands.

The plaintiff's total for these lands is $12,487; defendants' appraisal, $9,167. There is no such decided preponderance of evidence in plaintiff's favor as to overcome the testimony in support of defendants' appraisal, except that there should be added $100 and interest thereon at 8 per cent. on account of the Twin Falls lands; the defendants' engineer omitting that amount, without explanation, from the appraisal of defendants' own expert witness. The total allowable for these lands, I find, therefore, is $9,275.

### Summary of Land Values.

| | |
|---|---|
| Power site lands | $102,666.96 |
| Transmission system lands | 72,125.00 |
| Substation lands | 24,398.00 |
| General office lands | 12,980.00 |
| Store department lands | 9,275.00 |
| Total value of lands | $221,424.96 |

### Buildings, Fixtures, and Improvements to Grounds.

For these items the defendants' appraisal exceeds the plaintiff's. Plaintiff conceding the acceptance of its own appraisal, which the majority adopts, and in which I concur, the amount is $286,418.

I concur with the majority of the court as to the following accounts, and find that as to them, where there is any dispute, after making due allowance for the effect of bias and partisanship of expert witnesses giving opinion evidence as to values, there is no greater difference in the claims asserted and appraisals made than is to be reasonably expected, and that a preponderance of the evidence shows that no less value should be included in the rate base than the following:

| | |
|---|---|
| For power plant, buildings, fixtures, etc., accounts 13, 24, and 25 | $4,930,200.00 |
| Transmission system | 2,376,000.00 |
| Accounts Nos. 29, 31, 32, 33, 35, 36, 38, and 40 | 4,007,880.00 |
| Franchises, account No. 2 | 14,688.00 |
| Office equipment, account No. 3 | 107,209.00 |
| Utility equipment, account No. 39 | 52,696.00 |
| Property additions from January 1, 1920, to June 30, 1924 | 6,367,321.00 |
| Property additions from June 30, 1924, to end of year 1925 | 281,000.00 |

I concur with the majority in not including in the rate base the capital invested in the merchandising business.

### Oxbow Service.

I am unable to agree with the majority as to the value of this service, which plaintiff appraises at $400,000, and defendants at $50,000, and which the majority of the court fix at $150,000. Defendants' expert witness was shown to be unfamiliar with this feature of plaintiff's system. He testified that a Diesel engine and 100-kilowatt generator would supply the stand-by service of the Oxbow. There was testimony for the plaintiff that such an engine would not even excite the transmission line and transformers. There was no testimony offered by defendants in reply to this. The boldness of this challenge, were it not true, called for further testimony on the part of the defendants. Nearly half the value of the Oxbow service is as a synchronous condenser at the northwest extremity of the power company's system. By its Order No. 873, December 21, 1922 (Exhibit No. 5), the Public Utilities Commission fixed service at Oxbow at $214,382 (page 68, vol. 1, abstract of evidence), and I conclude that no less an amount than that should be allowed for this item.

## Organization Expense—Account No. 1.

I am unable to agree with the majority in allowing organization expense, $400,000. The commission, in its Order No. 873 (Abstract of Record, p. 60, at page 79), made an allowance for incorporation of $206,430, and for direct reorganization expense $117,187.50, a total of $323,617.50. Defendants' engineer, Kopelman, evidently calculating there would be an added expense because of plaintiff's growth, allows for organization expense at $366,524.22. I am of the opinion that there is no clear preponderance of the evidence that warrants an allowance in excess of that amount.

## Water Rights.

For water rights plaintiff's appraisal is $201,046, and defendants' $39,751. The majority of the court allowed the full amount of plaintiff's claim, $201,046. This amount includes the cost of the overflowed lands at American Falls. These lands the plaintiff has sold to the United States, and has received part payment, and as part consideration has a contract with the United States for the storage of water. Under such circumstances, the cost of the lands overflowed is not the measure of value, and, there being no evidence as to the value of the rights plaintiff has acquired under its contract with the United States, the only amount properly allowable for this item is that conceded by defendants, $39,751.

## American Falls—New Unit.

The value of certain construction at American Falls, exclusively used in supplying power to the Utah Power & Light Company for use in Utah, the defendants included in the rate base. They also included in the revenue to be later considered the profit from plaintiff's contract with the Utah Company. The majority of the court conclude that the cost of such new construction, $629,444, should be excluded from the rate base. In this ruling I concur. It may be that, because other of plaintiff's property at American Falls also is in part used in connection with this contract, there should be a further deduction from the rate base on that account; but, if there is any testimony that would enable the court to make a finding of the proper amount to be deducted, it has not been pointed out.

## Going Concern Value.

I am unable to find any clear preponderance of the evidence of a going concern value greater than that fixed by the commission in Order No. 873 (volume 1 of Abstract of Record, page 60, at page 79), the amount being $823,682, and for that reason cannot concur in the finding of the majority of a value on that account of $1,500,000.

## Working Capital.

Plaintiff asks an allowance for working capital of $950,000. Defendants' engineer estimates the amount necessary at $564,445. The majority find as a reasonable amount $650,000. The commission, in Order No. 873 (Abstract of Record, vol. 1, page 60, at page 79), allowed for this item $700,000. It would therefore appear that the allowance should be no less than the latter amount.

## Summary.

A summary of the foregoing is as follows:

| | |
|---|---:|
| Lands | $ 221,424.96 |
| Buildings, fixtures, and improvements to grounds | 286,418.00 |
| Power plant buildings and fixtures, accounts 13, 24, and 25 | 4,930,200.00 |
| Transmission system, account No. 28 | 2,376,000.00 |
| Accounts Nos. 29, 31, 32, 33, 35, 36, 38, 40 | 4,007,880.00 |
| Franchises, account No. 2 | 14,688.00 |
| Office equipment, account No. 37 | 107,209.00 |
| Utility equipment, account No. 39 | 52,696.00 |
| Property additions, January 1, 1920, to June 30, 1924 | 6,367,321.00 |
| Property additions after June 30, 1924, including year 1925 | 281,000.00 |
| Organization expense, account No. 1 | 366,524.50 |
| Water rights, account No. 3 | 39,751.00 |
| Service at Oxbow | 214,382.00 |
| Going concern value | 823,682.00 |
| Working capital | 700,000.00 |
| I find a total value not less than | $20,789,176.46 |

## Depreciation.

Plaintiff contends that no greater allowance for depreciation should be made than $438,734. One of the experts for defendants testified to a depreciation of $3,086,091, and another to a depreciation of $3,965,785. The majority of the court estimates the depreciation at $2,000,000. I am unable to agree with them in the conclusion reached. The defendants' witnesses used the straight line method in fixing depreciation; refusing to consider the element of reproduction cost, in determining the base upon which the percentage of depreciation would be figured in the straight line method, would result in minimizing to some extent the depreciation, and the one mistake would tend to offset the other. It may be conceded that the straight line method, other things being equal, is not as sure a method of calculating depreciation as separate estimates of depreciation made upon inspection of the

various structural units of the property. Plaintiff's witnesses, in calculating depreciation, put out of consideration the probable life of the various units of the property, and based their calculations upon what they term "present service value." This is even a more faulty manner of determining the question of depreciation than the straight line method, for the straight line method, if fairly and normally applied, often, if not generally, will approximate the correct amount; while to give controlling effect to service value will never result in such approximation, except for the newest of properties.. Defendants' witness Fletcher, after determining the average life of the dollar invested in plaintiff's property, found it to be 7.92 years. He then testifies:

"Now, then, I have the average of this property. I have accepted the company's annual allowance for maintenance and retirement expense as the correct amount to set aside each year for depreciation. Having that as a guide, I am estimating the life of the property—I am estimating the per cent. of annual depreciation of this property to be 2.4. That is an anticipated life of between 41 and 42 years. On that basis, then, the annual depreciation will be $389,658. The difference between that and what is actually set aside for maintenance and depreciation I consider purely maintenance. The accrued depreciation, then, on this property on this basis, will be approximately $3,086,091, and the per cent. condition will be 80.99 per cent. It is common practice to determine depreciation in this way. I consider the most important evidence as to the depreciation of a property to be the average age of the dollar invested. It is a common practice among valuation engineers to set up life tables. I do not agree with the method of figuring accrued depreciation adopted by the engineers who have testified on behalf of the Idaho Power Company. I think it is ridiculous to say that this plant is 97 per cent. new."

I am unable to find any clear preponderance of evidence in plaintiff's favor of a depreciation less than the sum fixed by defendants' witness Fletcher—$3,086,091, diminished by $500,000 to cover any faults in his method of calculation and on account of bias or zeal upon his part in his opinions concerning this subject. Upon the whole evidence, I cannot find a preponderance showing depreciation less in amount than $2,586,091. Deducting the amount of the depreciation from the total value of the property found, $20,789,176, there remains $18,203,185. This is the total value of the property, both that in Idaho and that in Oregon. Of this amount, 86 per cent. by use is apportioned to Idaho and 14 per cent. to Oregon. The amount, therefore, apportioned to Idaho, is $15,654,739.10.

### Rate of Return.

I agree with the majority of the court that a rate of return of 7 per cent. upon the value of the property is not confiscatory. In Boise Artesian Water Co. v. Public Utility Commission this court, in granting a preliminary injunction, adopted a 7 per cent. rate.

### Gross Revenues.

Exclusive of interest on consumers' delinquent accounts and income from merchandising and from Utah Power & Light Company, reference to which has been made above, there is no controversy as to the gross operating revenue. Exclusive of these items, the gross revenue for 1924 was $2,682,850. As pointed out, the majority of the court excluded from the rate base the cost of the unit constructed at American Falls for serving the Utah Power & Light Company, but have allowed as an item of revenue of the amount received upon the contract with this company $22,000 per annum. I am unable to agree to the inclusion in the revenue of plaintiffs any part of its receipts from this contract, because supplying the Utah company over the lines of the two companies with electric power at Salt Lake City is interstate commerce. No question is made but that power directly delivered from one state to another constitutes interstate commerce. It is difficult to conceive of anything passing more directly to its destination than electric power. There is no evidence that any of the power sold to the Utah Company is used in Idaho. There is evidence that it is used in Utah. There is no evidence that none of it is used or sold in Idaho. If occasional use of it is made in Idaho, the value of that use has not been shown. Such being the case, it is not necessary to determine whether the arrangement made between the two companies would bring that feature of their business under the jurisdiction of the commission or not, as the extent and value of such service is in no manner shown. The items of interest upon consumers' delinquent accounts and income from the merchandising of plaintiff should also be excluded. Therefore only the agreed amount of gross income for 1924 (not abnormally increased in 1925) should be allowed—$2,682,850.

### Operating Expenses.

The plaintiff shows for operating expenses, inclusive of maintenance and retirement in 1924, $1,574,508. The defendants' accountant exhibits a statement showing such expense, without depreciation, for 1924, $1,381,306.

The items of expense in dispute are: (1) Supervision and special service of the electric Bond & Share Company; (2) regulatory commission expense; (3) taxes; (4) retirement expense; (5) uncollectible bills; (6) miscellaneous general expenses. I concur with the majority in allowing for the first of these an amount equal to that expended in 1924, the increase for 1925 being slightly in excess of 1 per cent.; the amount allowed being $52,-326.61. I also concur with the majority in allowing for regulatory commission expense $22,000, as there appears an abnormal increase in this expense since 1924, when it was $17,000; there being no evidence warranting a finding that such increase will be diminished in the future. There should therefore be added to its operating expenses, as stated above in plaintiff's showing for that year, the difference between $17,000 and $22,000, to wit, $5,-000, on this account.

### Taxes.

Plaintiff's taxes for 1924 were $249,592. In defendants' set-up there is allowed an even greater amount. This is because of including the American Falls unit, which we have excluded. The evidence shows for later years a substantial increase in the taxes. While taxes for the future will probably exceed $300,000, yet to include in the expenses the full amount, as the court has adopted the year 1924 for the purpose of the necessary calculations, because of the normal character of the transactions for that year, would throw the calculation out of balance. I therefore conclude that no greater amount should be allowed on account of taxes than $300,000. This results in increasing the expense stated for plaintiff for the year 1924, by the addition of the difference between $249,592 and $300,000, to wit, $50,408.

### Retirement Expense.

The retirement expense shown for 1924 was $205,000. The majority of the court, with whom I concur, allow for this expense $230,000. This results in a further increase of the total for 1924 by an additional $25,000.

### Uncollectible Bills.

Plaintiff claims upon this account, $50,-000. In defendants' set-up there is made an allowance on account of this item of $23,100. The majority of the court has allowed for uncollectible bills, $30,000. I am unable to see why anything should be allowed for uncollectible bills. Plaintiff's business is such that it can compel payment in advance or the giving of security for its bills. If they are uncollect-

ed, there is no reason why the rate payer who does pay in full for service given by plaintiff should also pay for the service given those who do not pay, and from whom the plaintiff could have demanded payment before rendering service. City of Knoxville v. Knoxville Water Co., 212 U. S. 1, at page 12, 29 S. Ct. 148, 53 L. Ed. 371. As long, however, as defendants concede $23,100 on this account, I conclude to that extent it should be taken into account in determining the total amount of general expenses. The amount included in the 1924 expenses for uncollectible bills was $163,328.32; deducting from this $23,100, there remains $140,228.32, which should be subtracted from the amount of the expense for 1924.

### Miscellaneous General Expenses.

For 1924, plaintiff asserts miscellaneous general expenses amounting to $61,120.62. For 1925, defendants' accountant finds from plaintiff's accounts $48,426, and for 1926, $50,847. The majority allowed $50,000. A statement of the nature and amount of the items of miscellaneous general expenses was prepared. This statement is as follows, omitting therefrom the years prior to 1924:

|  | 1924. |
|---|---|
| Local civic dues and expenses | $ 3,536.95 |
| Expense—registrars, transfer and coupon agents, stockholders' meeting, reports, etc. | 8,758.46 |
| Electrical Association, dues and expenses | 1,877.83 |
| Company employees' magazine | 5,424.45 |
| General advertising | 7,781.60 |
| Operation of company motor vehicles | 3,662.33 |
| Directors' fees | 1,160.00 |
| Officers' travel and petty disbursements | 6,483.98 |
| Other employees' travel and petty disbursements | 3,448.95 |
| Donations | 2,256.19 |
| Premium on bonds—bank deposits and franchises, etc. | 476.50 |
| Miscellaneous (items under $50) | 4,106.55 |
| Rate expense | 0 |
| Changing storehouse to machine shop | 0 |
| Special expense % contract negotiations | 0 |
| Bank deposit losses | 5,488.80 |
| Special inspection customers' service | 3,620.25 |
| Operation communication system | 278.50 |
| Stores shrinkage | 1,095.67 |
| Cr. % salesroom and window lighting, charged to merchandise | 1,583.40 |
| Cr. % rental company-owned offices charged to merchandise | 360.00 |
| Nampa P. F. E. shops | 600.00 |
| Donation Boise project | 2,184.60 |
| Experimental work, improvement of service | 351.25 |
| Loss % theft of cash, Pocatello | 472.16 |
| Totals | $61,120.62 |

Prima facie the following items are allowable:

General advertising .............. $7,781.60
Operation of company motor vehicles 3,662.33
Directors' fees................... 1,160.00
Officers' travel and petty disbursements .......................... 6,483.98
Other employees' travel and petty disbursements ..................... 3,448.95
Premium on bonds—Bank deposits and franchises, etc.................. 476.50
Special inspection customers' service 3,620.25
Operation communication system.... 278.50
Stores shrinkage ................. 1,095.67
Nampa P. F. E. shops............. 600.00
Experimental work, improvement of service ......................... 351.25

Defendants confine their objection to the allowance of club dues of officers and employees, and donations to charities and public enterprises, and losses of money once collected. For 1924 these items were:

Local civic dues and expenses...... $ 3,536.95
Electrical Association dues and expenses ......................... 1,877.83
Donations ....................... 2,255.19
Donation Boise project............, 2,184.60
Loss % theft of cash, Pocatello.... 472.16
                                   ----------
Totaling .................... $10,326.73

The evidence does not warrant the charge of these items to the rate payer. A further deduction should be made of $1,583.40 for window lighting of salesroom, and $360 rental, as both pertain to the merchandising of plaintiff. After a total deduction of $12,270.-13 from the miscellaneous general expense of 1924 of $61,120.62, there remains $48,850.49 allowable for miscellaneous general expense. The difference, $12,270.13, is a further deduction to be made from the total of the general expenses of 1924.

## Summary.

Of the amounts shown above, there should be added to the expense of 1924:

On account of increase in commission expense ........................ $ 5,000.00
On account of increase in taxes.... 50,408.00
On account of increase in retirement expense ........................ 25,000.00
                                   ----------
Total additions ............... $80,408.00

The amounts that should be deducted from the expense of 1924 are:

On account of reduction in amount of uncollectible bills............ $140,228.32
On account of elimination of certain items of miscellaneous expenses.. 12,270.13
                                   ----------
Total deductions ............ $152,498.45

Subtracting the total additions from the total deductions, there remains $72,090.45, by which amount the expense set-up for 1924 of $1,574,508 should be diminished. The amount remaining allowable for operating expense is not more than $1,502,417.55. Deducting the amount of the operating expense from the gross income, as found above, of $2,682,850, there remains net income for Idaho and Oregon, $1,180,432.45.

It appears without question that, of the foregoing net income for 1924, 89.91 per cent. should be apportioned to Idaho, and 10.09 per cent. apportioned to Oregon. The net income for Idaho for the year 1924, therefore, is not more than $1,061,326.81. Upon the total of the rate base apportioned to Idaho—that is $15,564,739—the above amount of net income apportioned to Idaho amounts to 6.7 per cent.

I agree with the majority that the rates established by the commission for charitable institutions, water heating, air heating, and for irrigation are invalid. If these special rates are abolished, and the correction then asked by plaintiff made, the plaintiff estimates an increased revenue of $249,000. 89.91 per cent. of this estimated increase is $223,875.90; this added to $1,061,326.81, the amount of the 1924 net income apportioned to Idaho, produces a total of $1,285,202.71. This amount is over 8 per cent. upon the rate base apportioned to Idaho. Such a rate of return would not be invalid, because not noncompensatory. The special rates being invalid, an injunction should issue restraining their enforcement, except any which may have expired by limitation. Neither side to recover costs.

## Addendum.

Judge DIETRICH has called my attention to the fact that, while of these accounts appearing at page 61 of the majority opinion (see 19 F.[2d] 572), totaling $21,199,746, I have concurred in $20,789,176.46, page 9 of the foregoing (see 19 F.[2d] 585), and while I have rejected the American Falls unit in the service of the Utah company, I have not deducted from the above total the amount of the rejected item, which is included in such total. This would further reduce the rate base $629,-444, but does not otherwise affect the result.